[No. A114953. First Dist., Div. Three. Aug. 29, 2007.]

JASPER RICE et al., Plaintiffs and Appellants, v.
CENTER POINT, INC., et al., Defendants and Respondents.

## COUNSEL

Bradford C. Floyd for Plaintiffs and Appellants.

Maire & Beasley, Wayne H. Maire and Cheryl A. Miskei for Defendant and Respondent Humboldt Recovery Center, Inc.

Mitchell, Brisso, DeLaney & Vrieze, Paul A. Brisso and William F. Mitchell for Defendant and Respondent Center Point, Inc.

## OPINION

**POLLAK, Acting P. J.**—Plaintiffs Jasper Rice and Jennifer Asbury appeal from a judgment dismissing their complaint for negligence in which they alleged that defendants Center Point, Inc. (Center Point), and Humboldt

Recovery Center, Inc. (HRC), were liable for the criminal behavior of four residents who injured plaintiffs after escaping from defendants' drug rehabilitation program. The trial court granted defendants' motion for judgment on the pleadings on the ground that defendants did not owe plaintiffs a legal duty of care to control the criminal behavior of the residents of their treatment facility. We affirm.

## Factual and Procedural History

Plaintiffs filed a complaint against defendants alleging a single cause of action for negligence and negligent infliction of emotional distress. The complaint alleges that on July 23, 2004, plaintiffs were attacked, stabbed and seriously injured by four California Department of Corrections (CDC) inmates who had been placed in and escaped from a nearby residential substance abuse treatment facility operated by HRC. The facility, which was licensed by the State Department of Alcohol and Drug Programs (ADP), provides "a non-hospital 24-hour residential substance abuse program" and also "a special treatment program for 'criminal justice clients.' " Center Point held a contract with the CDC pursuant to which inmates participated in HRC's residential treatment program.

On the night in question, the "inmates stole a non-secured knife from the kitchen of the subject HRC site, and thereafter escaped from the subject HRC site." The "inmates traveled to the Cooper Gulch Park area, where they subsequently attacked, stabbed, and seriously injured plaintiffs."

The complaint alleges that "as a licensed and/or certified residential treatment facility, HRC had a legal duty to comply with ADP's health and safety licensing requirements including but not limited to HRC's plan of operation, reporting requirements, personnel requirements, admission agreements, building and grounds compliance, outdoor and indoor activity space, fixtures, equipment, and site security." Similarly, "Center Point had a legal duty, among other things, to ensure that the subject HRC facilities complied with ADP licensing and/or certification requirements, reasonable security precautions, and to ensure that CDC inmates did not escape from the HRC residential treatment sites." "Center Point and/or HRC negligently and/or recklessly failed to provide and/or enforce reasonable security measures at the HRC site."[1]

---

[1] Although the complaint includes the quoted allegation that defendants' failure to act was reckless, plaintiffs did not assert a cause of action for gross negligence or intentional misconduct. On appeal, plaintiffs acknowledge that their complaint "alleges a cause of action for general negligence against HRC and its alter ego Center Point." Consistent with their pleading, plaintiffs argue that defendants are liable for plaintiffs' injuries because they failed to exercise "ordinary care" in the management of the facility and control of their residents.

Defendants moved for judgment on the pleadings on the ground that "as a matter of law and public policy, [plaintiffs'] claims cannot be asserted against the rehabilitation facility." In opposition, plaintiffs included the following additional facts in their memorandum of points and authorities:[2] "Prior to and including July 23, 2004, HRC was supposed to have, in operable working condition, an alarm system to detect whether any of its residents improperly left the facility. On July 23, 2004 the alarm system at HRC was nonfunctional and had been nonfunctional for a substantial period of time. As a result, late in the evening of July 22 or early in the morning of July 23, 2004, when the four CDC residents of HRC slipped out of the facility through a window, the alarm did not alert the HRC staff that these residents had improperly exited the building. (HRC residents are required to remain in the facilities after dark.) [¶] Prior to and including July 23, 2004, HRC was supposed to secure all knives used for eating, including 'steak knives' it kept on site. Contrary to state requirements, HRC did not lock up its knives. As a result, one or more of the four CDC residents that slipped out of the window on July 22 or 23, 2004, took a 'steak knife' that was then used in the attack on plaintiffs. [¶] Prior to and including July 23, 2004, HRC was supposed to have staff employees on site 24 hours per day. HRC did have staff 24 hours per day, but the employee working the evening that HRC's four CDC residents wrongfully exited the residential facility was an individual on parole, that was not supposed to be around other parolees or [CDC] inmates. This employee, upon learning that the 4 clients had wrongfully vacated the residential facility, did not contact law enforcement for fear that he would be arrested for violating his parole. [¶] The four clients that wrongfully exited HRC's residential facility had been released to HRC by the CDC through a drug treatment program to finish out the few remaining months of their sentences. To qualify for this program, inmates could not have a conviction of a violent crime such as murder or rape. One of the four clients, Javier Zamorano, the individual mainly responsible for injuring plaintiffs, had been convicted and was serving prison time for assault with a deadly weapon, which is listed as a violent crime under the California Penal Code. Mr. Zamorano should not have been participating in the drug treatment program, and HRC knew or should have known this fact and that Mr. Zamorano posed a significant danger to the

---

[2] These facts were beyond the scope of the motion because they were not alleged in the complaint or subject to judicial notice. (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166 [59 Cal.Rptr.3d 142, 158 P.3d 718].) Nonetheless, the additional facts were considered by the court and, as discussed below, ultimately included in a proposed amended complaint. Accordingly, we too assume these factual allegations to be true for the purpose of determining whether the complaint states a cause of action or could be amended to state a cause of action.

neighborhood in which the residential facility was located . . . ." The trial court granted defendants' motion without leave to amend on the ground that as a matter of public policy defendants did not owe a duty to plaintiffs to exercise reasonable care to control the wrongful conduct of their residents.

Shortly thereafter, plaintiffs filed a motion for reconsideration based on newly discovered facts that had become available after the Eureka Police Department produced in discovery its investigation report of the incident. Plaintiffs' motion relied on statements in the police report that were made by Mr. Reed, the HRC house manager. The report included an admission by Reed that he did not live onsite at the subject facility. In addition, although defendant was required to conduct and record participant counts four times daily, "Mr. Reed admitted he normally performed random head counts on the inmates/HRC clients, but the times were sporadic. Mr. Reed further admitted there was no documentation except a check box list, which did not accurately reflect the time of those checks. Mr. Reed estimated that on or about July 23, 2004, he had set the alarm at the subject HRC facility at approximately 10:30 p.m. or 11:00 p.m. Then he had returned to another HRC facility approximately block away." Finally, the police report indicated that despite policies requiring that all knives be secured, "there was no accountability" for knives kept at the HRC facility. These new facts, as well as those included in plaintiffs' opposition to the original motion, were included in a proposed amended complaint submitted with the motion for reconsideration.

While the trial court acknowledged that "the newly discovered facts further support plaintiffs' allegations of negligence in the operation of the treatment facility," it concluded nonetheless that the facility did not owe a duty to plaintiffs based on the special relationship between defendants and their residents. Plaintiffs filed a timely notice of appeal.

### Discussion

"In an appeal from a motion granting judgment on the pleadings, we accept as true the facts alleged in the complaint and review the legal issues de novo. 'A motion for judgment on the pleadings, like a general demurrer, tests the allegations of the complaint or cross-complaint, supplemented by any matter of which the trial court takes judicial notice, to determine whether plaintiff or cross-complainant has stated a cause of action. [Citation.] Because the trial court's determination is made as a matter of law, we review the ruling de novo, assuming the truth of all material facts properly pled.' " (*Angelucci v. Century Supper Club, supra*, 41 Cal.4th at p. 166.)

■ " '[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.] The existence of a duty is a question of law to be decided by the court." (*Hansra v. Superior Court* (1992) 7 Cal.App.4th 630, 639 [9 Cal.Rptr.2d 216].)

■ As a general rule, "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 [185 Cal.Rptr. 252, 649 P.2d 894]; see *Beauchene v. Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 342, 347 [151 Cal.Rptr. 796] (*Beauchene*).) An exception to this rule has been recognized, however, where a special relationship exists between the defendant and either the person whose conduct needs to be controlled or the foreseeable victim of the third party's conduct. (*Beauchene, supra*, at p. 347.)

■ Here, it is clear that defendants did not owe a duty to plaintiffs as the foreseeable victims of the residents' criminal conduct. Such a duty is imposed only where the injury is foreseeable and the intended victim is identifiable. (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 752–753 [167 Cal.Rptr. 70, 614 P.2d 728], citing *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 439 [131 Cal.Rptr. 14, 551 P.2d 334] ["Although the intended victim as a precondition to liability need not be specifically named, he must be 'readily identifiable' "].) Contrary to plaintiffs' suggestion, the proximity of the park in which they were attacked to the HRC facility does not render plaintiffs identifiable or otherwise separate them from other members of the general public.

■ *Johnson v. State of California* (1968) 69 Cal.2d 782, 799 [73 Cal.Rptr. 240, 447 P.2d 352], relied upon by plaintiffs, does not contradict this conclusion. In that case, the court held that the state had a duty to warn a foster parent "of any matter that its agents knew or should have known that might endanger [her] family; at a minimum, these facts certainly would have included 'homicidal tendencies, and a background of violence and cruelty' as well as the youth's criminal record." (*Id.* at p. 786.) The court relied on well-established authority that "impose[s] a duty upon those who create a foreseeable peril, not readily discoverable by endangered persons, to warn them of such potential peril." (*Ibid.*) Unlike a specifically identifiable foster parent, plaintiffs were not identifiable simply because they were present in or resided near the park.

The more difficult question is whether a special relationship existed between defendants and their residents giving rise to a duty owed to the public to exercise reasonable care to control the criminal conduct of their residents. In *Beauchene, supra,* 88 Cal.App.3d 342, the court concluded that public policy considerations preclude the imposition of such a duty on the operators of a rehabilitation facility. In that case, it was alleged that a private rehabilitation center negligently allowed a resident with a long history of behavioral difficulties, criminal confinement and escape attempts to leave its facility without permission. The escapee went on a " 'crime spree' " and shot plaintiff. (*Id.* at p. 345.) Balancing " 'the public interest in safety from violent assault' [citation] against the public policy favoring innovative criminal offender release and rehabilitation programs," the court refused to impose a duty on such programs toward potential crime victims with whom failed parolees or probationers may come in contact. (*Id.* at pp. 347–348.) The court explained, "Although appellant's injuries may be grievous, '[o]f paramount concern is the detrimental effect a finding of liability would have on prisoner release and rehabilitation programs. Were we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs.' [Citation.] Each member of the general public who chances to come into contact with a parolee or probationer must risk that the rehabilitative effort will fail." (*Id.* at p. 348.)

Subsequently, in *Cardenas v. Eggleston Youth Center* (1987) 193 Cal.App.3d 331 [238 Cal.Rptr. 251] (*Cardenas*), a minor resident of a youth group home who " 'was a violent and unpredictable' person," left the open facility on a "pass" and attacked the plaintiff at a convenience store (*id.* at p. 333). The plaintiff claimed the operator of the home " 'had a duty to the general public, and the plaintiff in particular to exercise such custody and control [of the minor] to protect the general public and the plaintiff from [his] violent and unpredictable behavior.' " (*Ibid.*) The court disagreed, holding that the policy concerns cited in *Beauchene* militated against finding a duty to control residents of the facility. "Forced to choose between the competing interests presented in this case, we must, like the *Beauchene* court, without in the least minimizing the seriousness of the injury to the individual, defer to the imperative policy objective of encouraging innovative release and reha-bilitation programs for criminal offenders." (*Id.* at pp. 335–336.)

Plaintiffs acknowledge the holdings of *Beauchene* and *Cardenas* and the public policy articulated in those decisions. They argue, however, that public policy does not dictate that a residential treatment facility avoid liability if it is poorly or negligently operated. Plaintiffs assert "that the court must reasonably draw a line somewhere in a [residential treatment facility's] continuum of conduct for the purpose of accountability." Plaintiffs distinguish

*Beauchene* and *Cardenas* on the ground that unlike in those cases, defendants here negligently "failed to follow state mandated procedures in the operation of its [residential treatment facility] that not only caused the brutal attack on plaintiffs, but facilitated the attack."

Although plaintiffs refer to "state mandated procedures," they have not identified any specific statute, ordinance or regulation that defendants' conduct allegedly violated. The basis of the asserted requirements is allegedly found in "defendants' written policies and procedures, and/or terms of the written agreements formed between defendants and the State of California." Although not entirely clear from the complaint, the written agreement with the state to which plaintiffs refer presumably is HRC's plan of operation submitted to the ADP as part of the licensing process. (Cal. Code Regs., tit. 9, § 10517, subd. (a)(2).)[3] Plaintiffs have not, however, attached the plan of operation as an exhibit to their complaint or indicated which provisions of that agreement allegedly were violated by defendants. Nonetheless, because any deficiency in this regard likely could be cured by amendment, we shall assume that plaintiffs could properly plead a violation of a specific provision of defendants' plan of operation.[4]

---

[3] California Code of Regulations, title 9, section 10517, subdivision (a), provides, "As a condition of licensure, each applicant shall submit to the Department the following documents with the application for licensure: [¶] . . . [¶] (2) A current, written, plan of operation, containing at least: [¶] (A) A statement of program goals and objectives; [¶] (B) An outline of activities and services to be provided by the licensee; [¶] (C) A statement of the facility's resident admission policies and procedures; [¶] (D) Assurance of nondiscrimination in employment practices and provision of benefits and services on the basis of race, color, national origin, religion, sex, or mental or physical disabilities, pursuant to Title VI of the Civil Rights Act of 1964 (Section 2000d, Title 42, United States Code), the Rehabilitation Act of 1973 (Section 794, Title 29, United States Code); the Americans with Disabilities Act of 1990 (Section 12132, Title 42, United States Code); Section 11135 of the California Government Code; and Chapter 6 (commencing with Section 10800), Division 4, Title 9 of the California Code of Regulations. [¶] (E) A copy of the facility's resident admission agreement; [¶] (F) A table of the administrative organization of the facility. [¶] (G) A staffing plan, job descriptions, and minimum staff qualifications; [¶] (H) A sketch of the grounds, showing buildings, driveways, fences, storage areas, pools, gardens, recreation areas, and other space used by residents; [¶] (I) Floor plans which describe the dwelling capacity, intended use, and dimensions of the rooms; [¶] (J) Sample menus and a schedule for one calendar week, indicating the times of day that meals are to be served; and [¶] (K) Consultant and community resources to be utilized by the facility as part of its program."

[4] Plaintiffs have not asserted that the violation of the licensing agreement gives rise to a separate private right of action by plaintiffs. (See *Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 131 [62 Cal.Rptr.2d 620] [whether a statute or regulation creates a private right of action is a question of legislative intent resolved by examination of the language and purpose of the statutory provisions].) Rather, as discussed above, plaintiffs argue that the violation of the agreement supports their claim for negligence. (See *id.* at p. 126 [distinguishing between "the issue of whether a statute creates a wholly new private right to sue, and the use of a statute to establish an element of a preexisting common law cause of action"].)

Plaintiffs' attempt to distinguish *Beauchene* and *Cardenas* based on the violation of specific safety procedures, however, is not persuasive. HRC's failure to follow applicable operational policies or procedures did not give rise to a duty where none otherwise existed. Defendants' failure to comply with applicable safety regulations would at most demonstrate a lack of reasonable care, i.e., breach of the duty of care if such a duty were first determined to exist.

■ Plaintiffs acknowledge that "[w]hether a duty is owed is simply a shorthand way of phrasing what is ' "the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' " (*J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60].) Indeed, "duty ' "is a shorthand statement of a conclusion, rather than an aid to analysis in itself . . . . But it should be recognized that 'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." [Citation.]' [Citation.] . . . [¶] . . . [¶] . . . [I]n considering the existence of 'duty' in a given case several factors require consideration including 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Thompson v. County of Alameda, supra,* 27 Cal.3d at pp. 749–750.) In *Beauchene* and *Cardenas,* the courts concluded that the public policy of encouraging rehabilitation of criminal offenders, the lack of foreseeability of injury to an identifiable person, and the fact that the risk of injury is shared by all members of the general public militate against the imposition of a duty to exercise ordinary care in these circumstances. The balance is not altered because defendants allegedly violated a particular policy or procedure.

■ Although plaintiffs do not characterize their argument as such, their theory of liability is comparable to the theory of negligence per se. The negligence per se presumption, however, operates only to establish a lack of due care. "The presumption of negligence created by Evidence Code section 669 concerns the *standard* of care, rather than the *duty* of care." (*Rosales v.*

*City of Los Angeles* (2000) 82 Cal.App.4th 419, 430 [98 Cal.Rptr.2d 144].) For the presumption to come into play, "either the courts or the Legislature must have created a duty of care." (*Ibid.*) "[A]n underlying claim of ordinary negligence must be viable before the presumption of negligence of Evidence Code section 669 can be employed. . . . ' . . . [I]t is the tort of negligence, and not the violation of the statute itself, which entitles a plaintiff to recover civil damages. . . .' " (*California Service Station etc. Assn. v. American Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1178 [73 Cal.Rptr.2d 182].) "The statute . . . serves the subsidiary function of providing evidence of an element of a preexisting common law cause of action." (*Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 125 [62 Cal.Rptr.2d 620].)

■ Accordingly, defendants' alleged failure to comply with any policy or procedures for the safe operation of a residential drug treatment facility does not alter the sound conclusion reached in *Beauchene* and *Cardenas* that a residential treatment facility does not owe a duty to the general public to exercise ordinary care to control the criminal behavior of its program participants. Contrary to plaintiffs' assertion, this conclusion does not leave residential treatment facilities unaccountable for public safety. As noted above, HRC's facility is licensed by the State of California and is subject to oversight by the ADP. Failure to comply with applicable state regulations or defendants' written agreement with the state can result in civil penalties or the revocation of the facility's license. (Health & Saf. Code, § 11834.36 [grounds for suspension, revocation, or denial; modification of terms and conditions of license; temporary suspension]; see also Cal. Code Regs., tit. 9, §§ 10544 [licensing compliance reviews], 10547 [civil penalties], 10548 [suspension or revocation of license].)

Finally, we must determine whether the trial court abused its discretion in denying plaintiffs leave to amend their complaint. (*Foundation for Taxpayer & Consumer Rights v. Nextel Communications, Inc.* (2006) 143 Cal.App.4th 131, 135 [48 Cal.Rptr.3d 836].) " 'Denial of leave to amend after granting a motion for judgment on the pleadings is reviewed for abuse of discretion. [Citation.]' [Citation.] To show an abuse of discretion, the plaintiff has the burden of demonstrating that 'there is a reasonable possibility the plaintiff could cure the defect with an amendment.' " (*Ibid.*) Here, plaintiffs have not explained what facts they might add that would give rise to a duty to them. Their broad suggestion that additional facts might be uncovered through discovery is insufficient to justify prolongation of the action.

## Disposition

The judgment is affirmed. Defendants are to recover their costs on appeal.

Siggins, J., and Horner, J.,[*] concurred.

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution