
**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAYCEE DUGARD, individually, and as Guardian Ad Litem, for her Minor Child, <br><br> Plaintiff - Appellant, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant - Appellee. | No. 13-17596 <br><br> D.C. No. 3:11-cv-04718-CTB <br><br> MEMORANDUM[*] |

Appeal from the United States District Court
for the Northern District of California
Carlos T. Bea, Circuit Judge, Presiding

Argued and Submitted January 12, 2016
Pasadena, California

Before: CLIFTON and OWENS, Circuit Judges and SMITH,[**] Chief District
Judge.

Jaycee Dugard, individually and on behalf of her minor child, appeals from

the district court's order dismissing her claims under the Federal Tort Claims Act

---

[*] This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

[**] The Honorable William E. Smith, Chief District Judge for the U.S.
District Court for the District of Rhode Island, sitting by designation.

(FTCA).  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.  As the parties are familiar with the facts, we do not recount them here.

The FTCA, a limited waiver of the United States' sovereign immunity, provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances" under applicable state law. 28 U.S.C. § 2674.  Although the federal government "could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy." *LaBarge v. Mariposa Cty.*, 798 F.2d 364, 367 (9th Cir. 1986).

The most analogous cases to the case at issue here involve the liability of private criminal rehabilitation facilities.  Under California law, private companies that operate rehabilitation programs do not owe a duty of care to the public at large for the conduct of inmates or parolees under their supervision.  *See Cardenas v. Eggleston Youth Ctr.*, 238 Cal. Rptr. 251, 252-53 (Ct. App. 1987); *Beauchene v. Synanon Found., Inc.*, 151 Cal. Rptr. 796, 798-99 (Ct. App. 1979).  Instead, they owe a duty only to individuals that are foreseeable and specifically identifiable victims of their wards' conduct.  *Rice v. Ctr. Point, Inc.*, 65 Cal. Rptr. 3d 312, 316 (Ct. App. 2007); *see also Vu v. Singer Co.*, 706 F.2d 1027, 1029 (9th Cir. 1983). This rule is a result of California's strong public policy to encourage "innovative criminal offender release and rehabilitation programs." *Beauchene*, 151 Cal. Rptr.

2

at 799. As Dugard has not argued, and submits no facts to suggest, that she was a specifically identifiable victim, she would not have a viable claim against an analogous private person under California law.

Because a private individual in like circumstances would not be liable under California law, the United States cannot be held liable under the FTCA for the conduct of the parole officer here. As a result, we need not reach the discretionary function exception or proximate cause issues.

**AFFIRMED**.

*Dugard v. United States of America*
No. 13-17596

SMITH, Chief District Judge, dissenting:

I respectfully dissent. The majority's decision turns on its understanding that the most analogous cases for the purposes of determining liability under the Federal Tort Claims Act ("FTCA") are those involving private rehabilitation centers. In my view, this is an incorrect application of the FTCA and misapplies the case law relied on by the majority.

The FTCA provides that the United States is liable for the negligent conduct of its employees "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *see also* 28 U.S.C. § 1346(b). When determining if a state actor is analogous to a private entity, courts must "interpret these words to mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a 'private person' liable in tort." *United States v. Olson*, 546 U.S. 43, 44 (2005) (emphasis in original). And, when conducting this analysis, commonsense dictates that "where the government and its private party counterpart diverge in a significant respect, that circumstance must be taken into account in determining what is the 'most reasonable analogy.'" *Bush v. Eagle-Picher Indus., Inc.*, 927 F.2d 445, 452 (9th Cir. 1991) (abrogated on other grounds) (citing *LaBarge v. Mariposa County*, 798 F.2d 364, 367 (9th Cir. 1986)).

Here, on the surface, the so called "private rehabilitation center cases" cited by the government[1] provide a tempting analogue to the United States Parole Commission because both deal broadly with individuals who have broken the law and are in some stage of incarceration, transition on parole/probation, or supervision; however, upon closer examination, it is clear that these cases are an *exception* to the general rule under California tort law that, where there is a special relationship, there is a duty to warn or control that extends to foreseeable, but not readily identifiable victims, provided that the action required would be reasonable and not futile. As I explain in detail below, the courts in the rehabilitation center cases effectively granted those facilities a form of immunity—essentially a carbon copy of the immunity enjoyed by their public counterparts—because they found that the public policy considerations were so strong as to preclude a finding of a duty. No such considerations are present in this case, and there is virtually no policy reason to extend this judicially created immunity to U.S. Probation. Because other private parties with a duty to control or warn based on a special relationship provide a closer private party analogue, summary judgment in favor of the government is not warranted.

---

[1] *See Vu v. Singer Co.*, 706 F.2d 1027 (9th Cir. 1983); *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949 (Cal. Ct. App. 2007); *Cardenas v. Eggleston Youth Ctr.*, 193 Cal. App. 3d 331 (Cal. Ct. App. 1987); *Beauchene v. Synanon Found., Inc.*, 88 Cal. App. 3d 342 (Cal. Ct. App. 1979).

2

## I. The Duty to Control or Warn under California Law

In order to set the stage for the private person analogy analysis on which this case turns, a chronological review of the development of California tort law concerning the duty to control and/or warn is necessary.

In 1966, in *Poncher v. Brackett*, 246 Cal. App. 2d 769 (Ct. App. 1966), a California appeals court held that grandparents had a duty to an unidentified victim of their violent grandson. The court explained that:

> The governing principle is expressed in section 319 of the Restatement Second of Torts as follows: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

*Id.* at 772-73. The court clarified that "[t]he ability to control the child, rather than the relationship as such, is the basis for a finding of liability on the part of a parent." *Id.* at 772. That is, it was not because it was a grandparent-child relationship in particular that the duty attached, but rather because it was some type of "special relationship" in which there was an ability to control.

In *Johnson v. State*, 69 Cal. 2d 782 (Cal. 1968), the California Supreme Court found that state employees had a duty to warn foster parents of the violent criminal history of a teenage parolee placed in their care. In so holding, the Court found that

3

the state employees did not have immunity under Government Code section 845.8, which provides that:

> Neither a public entity nor a public employee is liable for:
> (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release.
> (b) Any injury caused by:
> (1) An escaping or escaped prisoner;
> (2) An escaping or escaped arrested person; or
> (3) A person resisting arrest.

Cal. Gov't Code § 845.8. In giving this narrow application to § 845.8, the court reasoned that "[o]nce an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity." *Johnson*, 69 Cal. 2d at 795. The court added that "[t]his analysis, allowing immunity for basic policy decisions . . . but rejecting it for the ministerial implementation of that basic policy, receives support from a long line of cases in California and in federal courts, interpreting similar 'discretionary' language in section 2680, subdivision (a), of the Federal Tort Claims Act." *Id.* at 796.

Eight years later, in the landmark case *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d 425 (Cal. 1976), the California Supreme Court considered whether a therapist had a duty to warn a person threatened by a patient,

4

notwithstanding the general confidentiality obligations of that profession. There, the therapist had notified the police of a threat made by the patient, but did not notify the specific person, Tatiana Tarasoff, or her parents, about whom the threat had been made. The court held "that defendant therapists cannot escape liability merely because Tatiana herself was not their patient" because the "special relationship" between therapist and patient created a duty "to use reasonable care to protect the intended victim against such danger." *Id.* at 431. What constitutes "reasonable care," the court said, is a fact-dependent analysis: "it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, *or to take whatever other steps are reasonably necessary under the circumstances*." *Id.* at 431 (emphasis added).

In 1979, *Beauchene v. Synanon Found., Inc.*, 88 Cal. App. 3d 342 (Cal. Ct. App. 1979), considered whether a private rehabilitation facility could be held liable for the criminal conduct of a convict who, after being released into the defendant's care, escaped and injured the plaintiff. The plaintiff argued that the facility had been negligent in screening the convict, and he should never have been let into the program. The issue in *Beauchene* was whether the facility owed the plaintiff a duty based on the "special relationship . . . between the defendant and the active wrongdoer." *Id.* at 347

5

(citing *Tarasoff*, 17 Cal.3d at 435.) The court found no liability on public policy grounds. The court first explained that under California law:

> Principal policy considerations in deciding whether a duty exists include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Id.* at 347 (quoting *Rowland v. Christian*, 69 Cal.2d 108, 113 (Cal. 1968)). With that framework in mind, the court found that "[a]lthough appellant's injuries may be grievous, '[of] *paramount concern* is the detrimental effect a finding of liability would have on prisoner release and rehabilitation programs. Were we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs.'" *Id.* At 348 (emphasis added) (quoting *Whitcombe v. County of Yolo*, 73 Cal. App. 3d 698, 716 (Cal. 1977)). In order to address the paramount concern about the effect that liability would have on the development of innovative prisoner release and rehabilitation programs, the Court reached for the immunity cloak provided by § 845.8 to public entities and employees discussed and distinguished in *Johnson*, and applied it to private facilities as if they were public:

6

> Respondent concededly is not a "public entity or public employee" within the meaning of section 845.8. But the same public policy that moved the Legislature to immunize *public* release and rehabilitation programs from liability-to encourage such innovations in the interests of criminal justice-compels the conclusion that respondent's *private* release and rehabilitation program owed no legal duty to this appellant. In light of the purpose behind the governmental immunity, it would be incongruous to hold that, while the state is immune from liability for its decision to assign Bentley to, and his unauthorized departure from, the Synanon program, the program itself owed appellant a duty not to accept Bentley or to prevent his unauthorized departure.

*Id.* (emphasis in original). Thus, the *Beauchene* decision was driven by the court's conclusion that "[t]o hold respondent civilly liable would deter the development of innovative criminal offender release and rehabilitation programs, in contravention of public policy." *Id.*

Following *Beauchene*, the California Supreme Court decided *Thompson v. Cty. of Alameda*, 27 Cal. 3d 741 (1980). There, a juvenile offender who was released from a county detention facility into the custody of his mother had threatened that, if released, he would kill a young child in the neighborhood. The court held that the city of Alameda had no duty to warn the neighborhood parents, the police, or the child's mother. The court explained that "[i]n deciding whether a duty to warn should be imposed, we inquire under our *Rowland v. Christian*, [69 Cal.2d 108, 113 (Cal. 1968)], formulation concerning the probable beneficial effect if such warnings were routinely and generally given." *Id.* at 755. The court then reasoned:

7

> We are skeptical of any net benefit which might flow from a duty to issue a generalized warning of the probationary release of offenders. In our view, the generalized warnings sought to be required here would do little to increase the precautions of any particular members of the public who already may have become conditioned to locking their doors, avoiding dark and deserted streets, instructing their children to beware of strangers and taking other precautions.

*Id.* The court distinguished *Johnson* and *Tarasoff* because in those cases there was a specifically identifiable victim, and therefore a warning would not have been futile or against public policy:

> [I]t is fair to conclude that warnings given discreetly and to a limited number of persons would have a greater effect because they would alert those particular targeted individuals of the possibility of a specific threat pointed at them. In contrast, the warnings sought by plaintiffs would of necessity have to be made to a broad segment of the population and would be only general in nature. In addition to the likelihood that such generalized warnings when frequently repeated would do little as a practical matter to stimulate increased safety measures, as we develop below, such extensive warnings would be difficult to give.

*Id.* at 755. The court acknowledged that "[i]n those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims *who can be effectively warned of the danger*, a releasing agent may well be liable for failure to warn such persons." *Id.* at 758 (emphasis added). With respect to the police, the court noted that "warnings to the police as urged by plaintiffs ordinarily would be of little benefit in preventing assaults upon members of the public by dangerous persons unless we were simultaneously and

8

additionally to impose a concurrent duty on the police to act upon such warnings. As we noted in *Tarasoff*, *supra*, no such duty to act exists." *Id.* at 756. Finally regarding the juvenile offender's mother, the court reasoned that:

> notification to the offender's mother of James' threat in our opinion would not have the desired effect of warning potential victims, at least in a case such as that herein presented. . . . The imposition of an affirmative duty on the County to warn a parent of generalized threats without additionally requiring, in turn, some affirmative action by the parent would prove ineffective.

*Id.* at 757. Like with the police, because the mother did not have a duty to take some affirmative action upon receiving the information about her son's threat, the court found that the warning would not have been effective.

Notably, Justice Tobriner, the author of *Johnson* and *Tarasoff*, dissented from the majority's formulation, finding that the failure to warn the mother *did* state a cause of action. Justice Tobriner explained that "the absence of an identifiable victim does not postulate the absence of a duty of reasonable care." *Id.* at 760. "Instead, [*Johnson* and *Tarasoff*] stand for the principle that a special relationship, such as that between the state and a person in its custody, establishes a duty to use reasonable care to avert danger to foreseeable victims. If the victim can be identified in advance, a warning to him may discharge that duty; if he cannot be identified, reasonable care may require other action." *Id.* The fact that the specific victim was not identifiable in advance "cannot absolve the state from its failure to warn James' mother so that she could

9

exercise proper care in observing and supervising James and thereby preventing the harm that ensued." *Id.* at 761. The majority countered this argument—not by disputing the dissent's formulation of the law concerning an identifiable victim—but instead by noting that "[t]he dissent['s] speculat[ion] that the mother 'might' have taken special care to control her son had she been warned of James' threats" was "attenuated conjecture," which "cannot alone support the imposition of civil liability." *Id.* at 757. Moreover, the majority explained, "it is contrary to the very purpose of such a release to speculate that a mother in whose care a nearly 18-year-old offender has been temporarily placed would thereby assume the constant minute-to-minute supervision that would have been required to prevent the tragedy." *Id.* at 758.[2]

At the heart of the majority's decision in *Thompson* was a deep concern about expanding the reach of *Johnson*—which held that statutory immunity under § 845.8 did not protect a county from liability for failure to warn of danger disconnected from the decision to parole—and *Tarasoff*—which cemented the probability of liability for failure to warn in special relationship situations—to require that the government issue

---

[2] The Court's conclusion on this point is dubious to be sure: a warning to the mother might very well have been effective; and reporting a threatening presence to the police and community is a mainstay of sex offender notification laws, both state and federal. *See* Sex Offender Registration and Notification Act, Pub. L. No. 109-248, Title I (2006). But that debate is beyond the scope of the question here.

"generalized warnings" to the public every time a parolee is released.[3] Indeed, the question before the Court was actually quite narrow: "[W]e examine the propriety of imposing on those responsible for releasing or confining criminal offenders *a duty to warn of the release* of a potentially dangerous offender who, as here, has made a generalized threat to a segment of the population." *Id.* at 750 (emphasis added). Looking to *Beauchene* for support, the court found that these generalized warnings would be against public policy:

> Furthermore, such notice might substantially jeopardize rehabilitative effort both by stigmatizing released offenders and by inhibiting their release. It is also possible that, in addition, parole or probation authorities would be far less likely to authorize release given the substantial drain on their resources which such warnings might require. A stated public policy favoring innovative release programs would be thwarted.

*Id.* at 757. The majority found further support in the fact that "the County's original decision to release James . . . is a decision we already hold is immunized from liability." *Id.* at 757-58.

On the heels of *Thompson*, this Circuit upheld the finding of no duty in a case where a Job Corps program failed to control its residents. *Vu v. Singer Co.*, 706 F.2d

---

[3] Although *Thompson* considers the duty of a public entity, its holding provides an important basis for the private rehabilitation cases that follow. Accordingly, the justifications for the holding in *Thompson* also form the justifications for exempting private rehabilitation facilities from their special duty—public policy concerns and that any warning would be futile. As detailed below, neither of these justifications applies to federal parole officers, a difference that warrants looking to other analogous private entities.

1027, 1030 (9th Cir. 1983). The Court came to this conclusion for two reasons. First, it found that California law with respect to the duty to warn mandates that the "victim must be foreseeable and specifically identifiable." *Id.* (citing *Thompson*, 27 Cal.3d 741). Second, the Court pointed to the same policy concerns voiced in *Beauchene:*

> To impose on the operator of a center a duty to prevent the tortious acts of corps members and to impose liability to the victims of such acts for having failed to do so would place in some degree of jeopardy the Job Corps program and its efforts towards the rehabilitation of disadvantaged young people. Faced with such potential liability an operator with any concern for its economic survival could be expected to terminate from the corps any person whose conduct suggests that he might pose a risk, whether it otherwise justifies termination or not. This would deprive of the program's benefits those most in need of rehabilitation.

*Id.*[4]

One month later, however, *Myers v. Quesenberry* clarified the holding of *Thompson*, stating that "the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim . . . does not preclude him from stating an action." 144 Cal. App. 3d 888, 892 (Ct. App. 1983). In *Myers*, a doctor had failed to warn a patient not to drive due to her uncontrolled diabetic condition; she struck the plaintiff, who sued the doctor. The court's analysis centered on the fact that "[a]s a practical matter, the doctors here could not have effectively warned Myers [the plaintiff victim] of the

---

[4] Judge Rothstein filed a concurrence in *Vu*, which recognized that the Court was bound by *Thompson*, but criticized that decision (relying on Justice Tobriner's dissent) as "enunciat[ing] a myopic view of foreseeability in the context of the duty to warn and to supervise." *Vu*, 706 F.2d at 1031 (Rothstein, J., concurring).

danger presented by [the patient] Hansen's driving. . . . However, they could easily have warned Hansen not to drive because of her irrational and uncontrolled diabetic condition." *Id.* at 892-93 (citations omitted). Of significance was the fact that "this probably would not have been a futile act. Having otherwise complied with her doctors' professional recommendations, Hansen presumably would have continued to follow their advice had they warned her not to drive." *Id. at 893.* The court distinguished this holding from *Thompson*—not because it involved a doctor-patient relationship—but because the warning would not, as a matter of law, have been futile: "Hansen is unlike the homicidal actors in *Thompson* and *Tarasoff* . . . . On these pleadings, we cannot factually presume Hansen would have ignored the doctors' warning." *Id.* Therefore the court concluded that "under these circumstances *where warning the actor is a reasonable step to take in the exercise of the standard of care applicable* to physicians . . . , liability is not conditioned on potential victims being readily identifiable as well as foreseeable. *Id.* (emphasis added) (citing *Thompson* , 27 Cal.3d at 752-753, 758; *Mavroudis v. Superior Court*, 102 Cal. App. 3d 594, 599-601 (Cal. Ct. App. 1980)).

In 1987, *Cardenas v. Eggleston Youth Ctr.*, 193 Cal. App. 3d 331 (Ct. App. 1987), again shielded a private rehabilitation facility from liability. Like in *Beauchene*, the result was wholly driven by public policy:

> We are persuaded that the public policy concerns that led the *Beauchene* court to find no duty on the part of that respondent should lead us to the same conclusion in the case at bar. We recognize that plaintiff has been grievously injured, but to permit him recourse against defendant would have a potentially devastating impact on private rehabilitation programs. Such programs, particularly in these times of overcrowded penal facilities, serve an indispensable public function. Forced to choose between the competing interests presented in this case, we must, like the *Beauchene* court, without in the least minimizing the seriousness of the injury to the individual, defer to the imperative policy objective of encouraging innovative release and rehabilitation programs for criminal offenders.

*Id.* at 335-36. The fact that the victims were not specifically identifiable did not factor into the analysis.

In 1995, a California appeals court reached a similar decision to that in *Myers* in *Reisner v. Regents of Univ. of California*, 31 Cal. App. 4th 1195 (Ct. App. 1995). There, a doctor failed to inform a patient, Jennifer, that she had contracted HIV from a blood transfusion. She later infected her partner, Daniel, who sued the doctor. As in *Myers*, the court held that "[f]or several reasons, it is immaterial that, in *Tarasoff*, the therapist knew the identity of his patient's intended victim whereas, in this case, Defendants did not know Daniel or even that he existed." *Id.* at 1199. In particular, "warning Jennifer would have been a *reasonable step to take* in the exercise of the standard of care applicable to physicians . . . and *we cannot factually presume Jennifer or her parents would have ignored Defendants' warning*." *Id.* at 1200 (emphasis added).

14

In 2003, *Bragg v. Valdez*, 111 Cal. App. 4th 421 (Ct. App. 2003), held a psychiatrist liable for releasing a dangerous patient from a mental hospital because the patient did not have insurance. The court noted that "without receiving any therapy, and without any notification to any other mental health care provider or the police, Lee was turned loose into an unsuspecting community. . . It is foreseeable that someone who is dangerous to others is liable to act out and be dangerous." *Id.* at 431. The court explained:

> This rule is in accordance with *Tarasoff* and subsequent case law that holds, "When the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant's duty extends to a third person with whom the defendant does not have a special relationship."

*Id.* at 432 (quoting *Reisner*, 31 Cal. App.4th at 1198).

The court also found that the psychiatrist was not immune under two state statutes: one granting immunity to psychiatrists who release patients prior to the end of the initial 72-hour commitment, and another, enacted after *Tarasoff*, that mandated that there could be no monetary liability to warn of a patient's threats "except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims." *Id.* at 432-34. The court reasoned that "[t]his case is not dealing with judgment calls, but a dereliction of

15

judgment"; thus, it did not fall under the purview of either of these statutes, the first of which was enacted to prevent the "inappropriate, indefinite, and involuntary commitment of mentally disordered persons" by protecting doctors' assessments of whether or not the person is a danger, and the second, which "sought to protect was the privileged communications between a psychotherapist and his or her patient in a treatment setting." *Id.* at 432-35. Moreover, the court found that "the trial court erred [] in analyzing this case as a *Tarasoff* case." *Id.* at 434. Because "this complaint does not allege a failure to warn a known victim," but "a negligent release based upon factors other than the professional judgment that is required when a psychiatrist treats an individual who is a danger to himself or to others. Thus, *Tarasoff* is inapplicable." *Id.*

In 2007, a California appeals court again found that a private rehabilitation center did not owe a duty to the general public in its vicinity. *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949 (Ct. App. 2007). In *Rice*, the court implicitly acknowledged that the fact that the plaintiffs were not identifiable victims was not fatal to their claim: the court first noted that "[h]ere, it is clear that defendants did not owe a duty to the plaintiffs as the foreseeable victims of the residents' criminal conduct," but then went on to state that "[*t*]*he more difficult question is whether a special relationship existed between defendants and their residents giving rise to a duty owed to the public to*

16

*exercise reasonable care to control the criminal conduct of their residents.*"  *Id.* at 955-56 (emphasis added).  On this second question, *Rice*'s outcome, like *Beauchene* and *Cardenas*, was driven almost exclusively by public policy.  The court first noted that "[i]n *Beauchene*, . . . the court concluded that *public policy considerations preclude* the imposition of such a duty on the operators of a rehabilitation facility." *Id.* at 956 (emphasis added).  The court then rejected the plaintiff's attempts to distinguish *Beauchene* and *Cardenas*, based on the fact that the *Rice* defendants had violated mandatory rules, reasoning that "HRC's failure to follow applicable operational policies or procedures *did not give rise to a duty where none otherwise existed*.  Defendants' failure to comply with applicable safety regulations would at most demonstrate a lack of reasonable care, i.e. breach of the duty of care if such a duty were first determined to exist.*"  *Id.* at 958 (emphasis added).

Reading these cases in chronological order, it becomes clear that rather than two separate lines of cases—one dealing with doctors and the other dealing with rehabilitation facilities—this is one line of cases dealing with the duty to control or warn based on a special relationship, which has developed, sometimes awkwardly, over time.  This line of cases begins with the general rule that a defendant has no duty to warn third parties who are harmed by a tortfeasor.  An exception to this rule based on "special relationships" was recognized by the California courts in *Poncher* (1966)

17

and *Johnson* (1968). In these cases, the Court said there was a duty to warn and/or control a person who posed a risk of harm to persons which was reasonably foreseeable. (*Tarasoff* further refined this duty with respect to specifically identifiable victims in certain circumstances.) Thereafter, the courts enacted a judicially created immunity for private rehabilitation facilities and similar programs based on important public policy considerations (an exception to the exception, so to speak). And where these policy considerations have not been present, the Court has continued to apply the *Poncher*/*Johnson* duty analysis.

Moreover, a slight but important refinement of the case law occurred with *Myers*, which clarified that a victim must be "foreseeable," but not "readily identifiable." *Myers*, 144 Cal. App. 3d at 892.[5] Instead, *Myers* and the cases that come after it dealing with victims who were not readily identifiable, focus on whether the proposed action that the defendant failed to take would have been "reasonable" given the facts of the case and public policy, and whether or not it would have been "futile." *Id.* at 892-93. The only exception is *Rice*, which did not reach the issue of whether a warning would have been futile because it found that *"public policy

---

[5] The district court here relied on *Vu* for the proposition that "one must know that the target of the risk is an identifiable and foreseeable victim." *Dugard v. United States*, No. 3:11-cv-04718-CTB, 2013 WL 6228625, at *9 (N.D. Cal. Nov. 27, 2013). But *Vu* was decided before *Myers*, which clearly stated that "the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim . . . does not preclude him from stating an action." *Myers*, 144 Cal. App. 3d at 892.

18

considerations *preclude*[*d*] the imposition of such a duty on the operators of a rehabilitation facility." 154 Cal. App. 4th at 956 (emphasis added). This is the same public policy mandate that drove the decisions in the earlier rehabilitation cases. *See Cardenas*, 193 Cal. App. 3d at 335-36 ("Such programs, particularly in these times of overcrowded penal facilities, serve an *indispensable public function*. Forced to choose between the competing interests presented in this case, we must, like the *Beauchene* court, without in the least minimizing the seriousness of the injury to the individual, defer to the *imperative policy objective* of encouraging innovative release and rehabilitation programs for criminal offenders." (emphasis added)); *Vu*, 706 F.2d at 1030 ("[T]he same public policy that moved the Legislature to immunize *public* release and rehabilitation programs from liability—to encourage such innovations in the interests of criminal justice—*compels the conclusion* that respondent's *private* release and rehabilitation program owed no legal duty to this appellant." (second italics added; first and third in original)).

Nothing in *Myers* limited its holding to a doctor-patient relationship. And the court had that opportunity: in distinguishing *Thompson*, the court could have said that duties exist in the doctor-patient context do not exist in other special relationships. Instead, the *Myers* court found that, unlike in *Thompson*, it could not "factually presume Hansen would have ignored the doctors' warning." *Myers*, 144 Cal. App. 3d

19

at 893. In *Thompson*, by contrast, the majority found that all of the suggested warnings—including warning the mother, about which the dissent disagreed—would have been futile, and further, would have created bad public policy. 27 Cal. 3d at 756; *see supra* at 7-12. However, in cases where there is a third party who can be "effectively warned of the danger," *id.* at 758, or another action that could easily be taken to prevent the harm without creating bad policy, there is a duty. *See Bragg*, 111 Cal. App. 4th at 431-34; *Reisner*, 31 Cal. App. 4th at 1198-1203; *Myers*, 144 Cal. App. 3d at 892-94.

## II. Most Analogous Private Party

With this backdrop in mind, I turn to determining whether "a private individual under like circumstances," 28 U.S.C. § 2674, to Defendant would be held liable under California law.

The two most recent cases—*Bragg* and *Rice*—are both progeny of *Poncher* and *Johnson*, and both present potentially compelling analogies: a psychiatrist who released a mentally ill and dangerous patient into society, and a private rehabilitation facility from which several inmates escaped. In both of these cases, like in the instant case, the question was whether a party who was responsible for the fact that a dangerous person had the opportunity to commit a crime, could be held liable for the harm caused by that person. Yet these two cases had opposite results: while the

20

psychiatrist was held liable, the rehabilitation facility was not. The question is why the opposite results? And which case lines up more closely with this one?

Taking a close look at these cases, it becomes clear that *Bragg*, not *Rice*, presents "like circumstances" to this case under California law. Although it is tempting to conclude that, because our case deals with the prison system rather than the medical system, *Rice* is more analogous, that is a red herring that hides the real comparison. The public policy considerations that dictated the result in the private rehabilitation cases like *Rice* (the need for immunity and futility of the putative warning) simply do not exist in this case. Instead, the policy motivations and the futility question align much more closely to those in *Bragg* and demonstrate that a

private person under circumstances similar to those here would be liable under California tort law.[6]

In *Bragg*, the court determined that "[p]reventing future incidents is [] furthered by imposing a duty to the injured party." 111 Cal. App. 4th at 431. Simply put, public

[6] A recent district court decision with analogous facts applied a similar approach, using "a person responsible for controlling the acts of a third party as described in Section 319 of the Restatement (Second) of Torts" as "the closest private analog." *Ben v United States*, No. 5:14-CV-0370 (CJS), 2016 WL 447713, at *11 (N.D.N.Y. Feb. 4, 2016). In that case, a defendant, Renz, who had been charged with receiving and possessing child pornography, was released from custody prior to trial and placed on electronic monitoring under the supervision of U.S. Probation and Pretrial Services Office for the Northern District of New York. *Id.* at *1. However, "Probation did not follow [its] procedures in Renz's case. More specifically, Probation did not develop a supervision plan for Renz, did not inspect Renz's electronic monitoring equipment (except perhaps on one occasion), and did not monitor Renz's tamper alerts as required even though tampering with 'location monitoring' equipment is considered a 'higher-risk violation.'" *Id.* at *3. While on supervised release, Renz committed crimes including kidnapping, rape, and murder. The court denied Defendant's motion to dismiss the FTCA claims against the Government, finding that Probation "had sufficient control over Renz to support a duty under § 319." *Id.* at *14. In doing so, the court rejected Defendant's argument that someone on supervised release is more akin to a voluntary outpatient of a medical/psychiatric facility (where New York courts had found no duty), as opposed to someone involuntarily committed to a mental facility (where courts had found a duty), because supervised release is not "in custody." *Id.* Like in the instant case, on the surface, the outpatient cases looked more analogous because Probation did not have "actual physical custody of the dangerous third person"; however, the court looked past the seemingly similar circumstances in the outpatient cases and interpreted them "as holding that because the medical/psychiatric had no other way of controlling the third parties' actions when they were away from the facilities," there was no duty. *Id.* Probation, by contrast, "had a relationship of control over Renz that did not require actual physical custody." *Id.*

22

policy favored imposition of a duty on hospitals to refrain from releasing dangerous patients simply because they do not have insurance. Moreover, the action required—not releasing the patient—clearly would not have been futile; it would have prevented the patient from committing the tort.[7] By contrast, in *Rice*, the court found that "public policy considerations *preclude* the imposition of such a duty on the operators of a rehabilitation facility." 154 Cal. App. 4th at 956. The court in *Rice* explained that "[w]ere we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs." 154 Cal. App. 4th at 956 (emphasis added). As a practical matter, liability for private rehabilitation facilities would result in those facilities going out of business and a worsening of the already daunting prison crisis in California.

Here, the public policy concerns align much more closely to *Bragg* than *Rice* and the other rehabilitation center cases. The private rehabilitation facility cases turned on the assumption that imposing liability would be the death knell of such facilities, and that it would be "incongruous" to attach liability to private facilities for

---

[7] It is important to keep in mind that *Bragg's* outcome did not hinge on the existence of a doctor-patient relationship. The psychologist was liable because the negligence was *not* in the course of performance of duties in the doctor-patient relationship; had that been the case, the psychiatrist would have had statutory immunity. 111 Cal. App. 4th at 432; *see supra* at 16-17. Thus, it cannot be said that the particular contours of the doctor-patient relationship, as opposed to the duties in other "special relationship" cases, drove the result.

actions for which their public counterparts were immune. These concerns simply do not exist in this case.

First, unlike imposing liability for the decision of whether or not to parole someone, there is little risk that imposing an obligation that parole officers follow their mandatory reporting duties will result in fewer people being released on parole. For starters, the U.S. Parole Commission effectively went out of business in the 1980s with the passage of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1988 (codified at 18 U.S.C. § 3551, *et seq*.). The only function of the Parole Commission thereafter was management of defendants who were paroled prior to that date. Since the late 1980s, sentencing decisions lie exclusively with federal judges, who prescribe length of incarceration plus supervision, or, alternatively, probation. These decisions, of course, all enjoy judicial immunity. To be sure U.S. Probation offices supervise defendants during their terms of supervised release or probation, but they no longer have any role in the deciding when a prisoner gets released. Consequently, there is virtually no risk that holding such officers responsible for negligence with regard to their failure to perform nondiscretionary functions will in any way undermine new or creative rehabilitation programs, or result in defendants being kept in prison for longer than necessary. Rather, imposing the duty of reasonable care called for by *Poncher*, *Johnson*, *Tarasoff*, and *Bragg*, will better

24

ensure that U.S. Probation offices perform their duties carefully, and follow protocols dutifully, as they should, bringing violations to the attention of U.S. District Judges (or, in the present case, the U.S. Parole Commission).

Second, the California courts' concern about holding private and public facilities to different standards is not at play here. The California Supreme Court recognized in *Johnson* that the policy considerations underlying the immunity provided by Section 845.8, did not apply in a situation like this one where the decision to grant parole had already been made: "Once an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them *presents no such reasons for immunity*." *Johnson*, 69 Cal. 2d at 795 (emphasis added);[8] *see also Vu*, 706 F.2d at 1029 ("California courts have recognized that [§ 845.8] provides an *exception* to the rule that special relationships can result in creation of duty." (emphasis added)). Thus, the evaluation in the rehabilitation facility cases that "the same public policy that moved the Legislature to immunize *public* release and rehabilitation programs from liability [under § 845.8]—to encourage such innovations in the interests of criminal justice—compels the conclusion that respondent's *private* release and rehabilitation

---

[8] As *Johnson* and *Thompson* were both public entity cases, they cannot be used as specific examples of a private person in like circumstances. However, they nonetheless provide the foundation for the California tort law concepts and public policy issues at play in this case.

25

program owed no legal duty to this appellant," *Cardenas*, 193 Cal. App. 3d at 335 (emphasis in original) (quoting *Beauchene*, 88 Cal. App. 3d at 348), does not apply to these facts.

Third, this is not a situation where imposing liability would result in "frequently repeated [warnings that] would do little as a practical matter to stimulate increased safety measures" and "would be difficult to give." *Thompson*, 27 Cal. 3d at 755. Indeed, unlike the police and the mother in *Thompson*, the Parole Board did have an affirmative duty to act upon receipt of the warning, and presumably would have acted in this case.

In contrast, similarities between the public actor in this case and the private actor in *Bragg* are numerous. Like *Bragg*, "[t]his case is not dealing with judgment calls, but a dereliction of judgment." *Bragg*, 111 Cal. App. 4th at 435. Here, a parole officer failed to report over 70 drug violations for a parolee who was known to be extremely violent when under the influence of drugs. And in this case, like in *Bragg*— which analyzed contours of the duty because the immunity and public policy issues that are peculiar to the private rehabilitation facilities were not applicable—"[p]reventing future incidents is [] furthered by imposing a duty to the injured party." 111 Cal. App. 4th at 431. Indeed, if the prevailing public policy in California is to encourage alternative rehabilitation programs, applying the same

26

duties to parole officers as those applied to physicians in *Bragg* and *Myers* would advance that policy. As many of the rehabilitation cases note, there is an inherent risk involved in paroling criminals, a risk that is considerably exacerbated by parole officers disregarding their responsibilities to the degree in which they were disregarded in this case. Mitigating the risk of danger associated with parole by holding parole officers responsible for carrying out mandatory tasks, makes it more likely—not less—that the public and government officials will support expansion of alternative rehabilitation programs. And imposing a duty on parole officers to conscientiously do their jobs has the added public policy benefit of protecting the public during the expansion of these programs. In essence, the same public policy that drove the result in *Bragg* applies here.

Moreover, as in *Bragg* "the burden to the defendant"—that parole officers follow mandatory reporting guidelines that they should be following anyway—is low; and, unlike in the private rehabilitation cases, the "consequences to the community of imposing a duty to exercise care with resulting liability for breach" are, overall, positive. *See Myers*, 144 Cal. App. 3d at 894 ("There also are no significant practical problems involved here in requiring physicians to warn patients not to engage in foreseeably dangerous conduct. . . . Our holding does not require the physician to do anything other than what he was already obligated to do for the protection of the

27

patient."). As suggested above, they would increase the support for alternative rehabilitation services while at the same time enhancing public safety.

Finally, there is in this case a specific party to warn which had control of the wrongdoer by virtue of his status as a parolee: the Parole Board. And the Court here cannot say that, as a matter of law, that such a warning would have been futile. At a minimum, this is a question of fact for the jury.

To sum up then, the FTCA requires this Court to look to the closest private sector analogue to determine if a private party would have a duty in like circumstances. The line of cases we should look to is the duty to control/duty to warn cases which represent the special relationship exception to the general rule that there is no duty to third parties harmed by the wrongdoer. That line of cases has its roots in *Poncher* and *Johnson*. And as the cases have developed, an exception to the special relationship exception has evolved where public policy considerations demand parity to the immunity afforded to public and private rehabilitation facilities and/or where the warning suggested would be futile. Where neither of these policy-based concerns is present, the courts have continued to find a duty to control or warn, evidenced by *Bragg* (control), *Tarasoff*, *Myers*, and *Reisner* (warn). Here, the policy considerations undergirding the rehabilitation center exception cases are plainly not present, and the warning/control that Plaintiff claims should have been made would likely have been

28

effective, and would promote exactly the behavior that principles of tort law are meant to promote: greater care, vigilance, and concern for the safety of foreseeable victims.[9]

For all of these reasons, I would reverse the district court's grant of summary judgment.

---

[9] The Government also argues that Dugard's claims are barred by the discretionary function exception of the FTCA, and that there is insufficient evidence for a factfinder to determine that the parole officers' alleged failure to report Garrido's drug violations to the Parole Commission proximately caused Plaintiffs' harm. I agree with the district court's analysis and decision on these two issues and find that neither provides grounds to bar Dugard's claims.