[No. B076913. Second Dist., Div. One. Jan. 26, 1995.]

DANIEL REISNER, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

## COUNSEL

Stanley K. Jacobs and Gregory J. Walters for Plaintiff and Appellant.

Patterson, Ritner, Lockwood, Zanghi & Gartner, Robert R. Scholl, Greines, Martin, Stein & Richland, Martin Stein and Roxanne Huddleston for Defendants and Respondents.

## OPINION

**VOGEL (Miriam A.), J.**—The day after 12-year-old Jennifer Lawson received a transfusion, her doctor discovered the blood was contaminated with HIV antibodies. Although the same doctor continued to treat Jennifer, he never told her or her parents about the tainted blood. Three years later, Jennifer started dating Daniel Reisner and they became intimate. Two years later, the doctor told Jennifer she had AIDS and Jennifer told Daniel. A month later, Jennifer died. Shortly thereafter, Daniel discovered he was HIV positive. Daniel sued Jennifer's doctor and others for negligence. The defendants moved for judgment on the pleadings, claiming they owed no duty to Daniel, an unidentified third person. The motion was granted. We reverse.

### FACTS

On April 18, 1985, during surgery performed at the UCLA Medical Center by Jennifer's physician, Eric Fonklesrud, M.D., Jennifer received blood and

plasma transfusions. The next day, Dr. Fonklesrud and UCLA learned the blood given to Jennifer was contaminated with human immunodeficiency virus (HIV) antibodies and the donor of the blood was notified—but neither Dr. Fonklesrud nor UCLA told Jennifer or her parents about the contaminated blood, either at that time or at any time during the next five years of Jennifer's continuing treatment.[1] More specifically, no one told Jennifer or her parents that Jennifer might develop acquired immune deficiency syndrome (AIDS) or warned them about the dangers of contagion or counseled them about precautionary measures to prevent the spread of the disease to others.

About three years later, Jennifer started dating Daniel and, at some point, they became intimate. Obviously, since Jennifer did not know she had been exposed to AIDS, she could not warn Daniel about the risk he was taking.

On March 7, 1990, Jennifer "was diagnosed as having AIDS and it was determined that she had become infected as a result of the blood transfusion received in 1985 at UCLA." Jennifer and her parents told Daniel and Daniel was immediately tested for AIDS. A month later, Jennifer died. Shortly thereafter, Daniel was told he was HIV positive.

Daniel sued Dr. Fonklesrud and the Regents of the University of California for damages. Motions for judgment on the pleadings by Dr. Fonklesrud and UCLA were granted with leave to amend as to Daniel's original and first amended complaints and, thereafter, Daniel filed his second amended complaint, the operative pleading on this appeal. The defendants again moved for judgment on the pleadings and, again, the motion was granted, this time without leave to amend—on the theory that no duty was owed to an unidentifiable third party. Daniel appeals from the judgment thereafter entered.

## DISCUSSION

█ When the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant's duty extends to a third person with whom the defendant does not have a special relationship. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425,

---

[1] On this appeal from a judgment on the pleadings, we accept as true the allegations of Daniel's operative pleading (*Croeni* v. *Goldstein* (1994) 21 Cal.App.4th 754, 758 [26 Cal.Rptr.2d 412]), and we do not speculate about the specifics of the charges.

434-436 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Dr. Fonkles-rud and UCLA concede as much but contend this rule does not create a duty where, as here, the third person is both unknown and unidentifiable. We disagree.[2]

In *Tarasoff*, a therapist who knew his patient intended to kill a young woman failed to warn the woman or her parents and the patient later killed the woman. When the woman's parents sued the therapist and others for her wrongful death, the therapist claimed the only duty he owed was to his patient. Our Supreme Court disagreed, holding that "[w]hen a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." (*Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d at p. 431.)

For several reasons, it is immaterial that, in *Tarasoff*, the therapist knew the identity of his patient's intended victim whereas, in this case, Defendants did not know Daniel or even that he existed.

### A.

First, *Tarasoff* dictates the result in our case by holding that the doctor's duty includes the duty to warn "others likely to apprise the victim of the danger . . . or to take whatever . . . steps are reasonably necessary under the circumstances." (*Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d at p. 431.) Daniel does not claim Defendants had to warn *him*, only that they had to warn *Jennifer or her parents*, "others [who were] likely to apprise [him] of the danger" (and, of course, did just that when they learned of it).

---

[2]This was the only issue raised in the trial court and it is the only issue properly before us on this appeal. Accordingly, we treat Dr. Fonklesrud and UCLA in the same manner, without regard to whether, for other purposes, they may stand in different positions vis-à-vis their liability to Daniel. (See, e.g., *Derrick* v. *Ontario Community Hospital* (1975) 47 Cal.App.3d 145, 154 [120 Cal.Rptr. 566] [a hospital does not owe a duty to warn a patient that she had contracted a contagious, communicable disease when the patient has an attending physician who has undertaken to treat and advise her].) For similar reasons, we do not reach Defendants' causation issues. Causation was not raised below and could not, in any event, be determined at the pleading stage in a case such as this.

## B.

Second, there is the case of *Myers* v. *Quesenberry* (1983) 144 Cal.App.3d 888 [193 Cal.Rptr. 733]. In *Myers*, two physicians (Quesenberry and Beaumont) were treating a pregnant patient (Hansen) for diabetes. During an examination at Quesenberry's office, the doctor concluded the fetus had died. When Quesenberry told Hansen to have the dead fetus removed within 18 hours, Hansen became emotionally upset. "The doctors then directed Hansen to drive immediately to [a local hospital] for preliminary laboratory tests. Hansen lost control of her car due to a diabetic attack and struck Myers as he was standing by the side of the road." (*Id.* at pp. 890-891.) Myers sued the doctors. The trial court sustained the doctors' demurrer without leave to amend and the issue on appeal was whether they owed a duty to Myers, with whom they had no relationship, for failing to warn their patient of the foreseeable and dangerous consequences of engaging in the conduct which caused Myers's injuries. (*Id.* at p. 890.)

The Court of Appeal reversed, holding (among other things) that "the fact that Myers was a foreseeable but not a readily identifiable victim of Hansen's driving does not preclude him from stating an action against the doctors for negligently failing to warn her not to drive in an irrational and uncontrolled diabetic condition. *As a practical matter, the doctors here could not have effectively warned Myers of the danger presented by Hansen's driving. . . . However, they could easily have warned Hansen not to drive because of her irrational and uncontrolled diabetic condition. Under the facts as alleged here, this probably would not have been a futile act.* Having otherwise complied with her doctors' professional recommendations, Hansen presumably would have continued to follow their advice had they warned her not to drive. . . . On these pleadings, we cannot factually presume Hansen would have ignored the doctors' warning. *Thus, under these circumstances where warning the actor is a reasonable step to take in the exercise of the standard of care applicable to physicians . . . , liability is not conditioned on potential victims being readily identifiable as well as foreseeable.*" (*Myers* v. *Quesenberry, supra,* 144 Cal.App.3d at pp. 892-893, italics added.)

Similarly, on the pleadings before us, where warning Jennifer would have been a reasonable step to take in the exercise of the standard of care applicable to physicians, Defendants' liability is not conditional upon Daniel's identity being known or ascertainable, and we cannot factually presume Jennifer or her parents would have ignored Defendants' warning. According to Daniel's complaint, as soon as Jennifer and her parents discovered Jennifer had AIDS, Daniel was immediately notified. As a result, it

appears a timely warning to Jennifer probably would have prevented Daniel's injury.

We reject Defendants' efforts to distinguish *Myers* by suggesting there is no "immediate temporal connection" here as there was in *Myers* (where the doctors *told* their patient to *immediately* drive to the hospital)—because Defendants did not *tell* Jennifer to become intimate with Daniel and because at least *three years* "elapsed between the negligent act and [Daniel's] injury." This analysis begs the question. Dr. Fonklesrud maintained a physician-patient relationship with Jennifer until she died, which was after Daniel's injury. Just as Dr. Fonklesrud knew or reasonably should have known that Jennifer was likely to get AIDS as a result of the contaminated blood, he knew or reasonably should have known that, as she matured, Jennifer was likely to enter an intimate relationship. What happened to Daniel as a result of Defendants' failure to warn Jennifer was just as foreseeable as what happened to Mr. Myers—which is why we reject Defendants' euphemistic effort to limit liability on an artificial and immaterial basis.[3]

## C.

■ Third, the facts of this case compel a conclusion designed to encourage the highest standard of care concerning communicable and infectious diseases, and Defendants' arguments to the contrary are red herrings.

### 1.

In *DiMarco* v. *Lynch Homes-Chester County* (1990) 525 Pa. 558 [583 A.2d 422], the Supreme Court of Pennsylvania considered this issue on facts strikingly similar to those of our case. In *DiMarco*, a blood technician (Viscichini) was accidentally punctured while taking a blood sample from a patient. When Viscichini learned the patient had hepatitis, she immediately sought treatment from two physicians, both of whom told her that, if she remained symptom free for six weeks, it would mean she had not been infected by the hepatitis virus. Although she was not told to refrain from sexual relations for any period of time, she did so until eight weeks after exposure. As she had remained symptom free during that time, she then resumed sexual relations with her boyfriend (DiMarco). Three months after exposure, Viscichini developed Hepatitis B and, three months after that, DiMarco was diagnosed as having the same disease. (*Id.* at p. 423.)

---

[3]Several other states have reached the same result as *Myers*. (See, e.g., *Gooden* v. *Tips* (Tex.App. 1983) 651 S.W.2d 364, 369-370 [43 A.L.R.4th 139]; *Kaiser* v. *Suburban Transportation System* (1965) 65 Wn.2d 461 [398 P.2d 14, 16]; *Wilschinsky* v. *Medina* (1989) 108 N.M. 511 [775 P.2d 713, 720]; *Welke* v. *Kuzilla* (1985) 144 Mich.App. 245 [375 N.W.2d 403, 406]; *Joy* v. *Eastern Maine Medical Center* (Me. 1987) 529 A.2d 1364, 1365-1366.)

DiMarco sued Viscichini's doctors, claiming they were negligent in not warning Viscichini that if she had sexual relations within six months of exposure she could infect her sexual partner. In affirming the existence of a duty owed to DiMarco, the court explained that when "*a physician treats a patient who has been exposed to or who has contracted a communicable and/or contagious disease, it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease.* Communicable diseases are so named because they are readily spread from person to person. *Physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others. The patient must be advised to take certain sanitary measures, or to remain quarantined for a period of time, or to practice sexual abstinence or what is commonly referred to as 'safe sex.'*

"Such precautions are taken *not* to protect the health of the patient, whose well-being has already been compromised, rather *such precautions are taken to safeguard the health of others.* Thus, the duty of a physician in such circumstances extends to those 'within the foreseeable orbit of risk of harm.' . . . If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person." (*DiMarco* v. *Lynch Homes-Chester County*, *supra*, 583 A.2d at pp. 424-425, some italics added.)[4]

2.

Defendants contend we should find they owed no duty to Daniel because the imposition of liability on these facts would not prevent future harm. According to Defendants, the search for a means to prevent or to cure AIDS "has been the subject of an unprecedented, worldwide mobilization of scientists, physicians and health care providers, with international conferences on the disease held in Atlanta, Paris, Washington, Stockholm and Montreal. (Grmek, History of AIDS (Princeton U. Press 1990) p. 182

---

[4] In *DiMarco*, a dissenting justice suggested the rules limiting an attorney's duty to his client (and those refusing to extend an attorney's duty to third persons) ought to be applied in the medical context. (*DiMarco* v. *Lynch Homes-Chester County*, *supra*, 583 A.2d at pp. 426-427, dis. opn. of Flaherty, J.) The majority disagreed, explaining that the "harm caused by a lawyer to a third party cannot possibly equal the harm that a physician can do to society at large by negligently failing to act to halt the spread of contagious and communicable diseases." (*Id.* at p. 425, fn. 1.) We agree with the majority and therefore reject the identical argument asserted in the case before us.

Literally billions of dollars are poured into efforts to combat the spread of AIDS." What this means, according to Defendants, is that it "defies logic to suggest that these heroic efforts fall short of an all-out effort to combat AIDS and that imposing tort liability to individual victims would speed up the search for better detection, treatment, and a cure." Defendants miss the point.

Civil liability for a negligent failure to warn under the circumstances of this case may not hasten the day when AIDS can be cured or prevented but it may, in the meantime, protect one or more persons from unnecessary exposure to this deadly virus.

### 3.

We summarily reject Defendants' alternative suggestion that a physician ought not to owe *any* duty to a third person because such a duty could adversely affect the doctor's treatment of his patient, to whom his primary duty is owed. As explained above, existing California law already imposes a duty to third persons and the only arguably "new" issue in this case is whether that duty is the same when the third person's identity is unknown to the physician and not readily ascertainable. And, contrary to Defendants' contention, the duty involved in this case—a duty to warn a contagious patient to take steps to protect others—has nothing to do with a physician's decision about how to treat his patient[5] or with a physician's potential liability for the unauthorized disclosure of AIDS test results. (Health & Saf. Code, § 199.20 et seq.) Once the physician warns the patient of the risk to others and advises the patient how to prevent the spread of the disease, the physician has fulfilled his duty—and no more (but no less) is required.

### 4.

We also reject Defendants' suggestion that we ought not to find a duty is owed to Daniel because it would necessarily follow that a duty would

---

[5]See Annotation, Liability of Doctor or Other Health Practitioner to Third Party Contracting Contagious Disease From Doctor's Patient, 3 A.L.R.5th 370, an annotation of cases considering whether a doctor is liable to a third party (1) for *failing to diagnose* a disease in his patient, (2) for *failing to inform the third person* of the contagious nature of the patient's disease, (3) for *negligently advising the third person* that there was no danger of infection or (4) for *failing to prevent the spread of the disease* to the third person. Other than *DiMarco* v. *Lynch Homes-Chester County, supra,* 583 A.2d 422 (discussed at 3 A.L.R.5th 370, *supra,* at § 10), none of the cited cases involved a failure to warn a contagious patient about what must be done to protect unknown third persons and the cases discussed in this opinion are the only ones we have been able to find on this issue.

be owed to "other persons with whom [Daniel] had sex, and the persons with whom they had sex," and so on ad infinitum. Why? Because "insurance premiums would soar and, quite likely, coverage at any price would not exist long." There are at least two reasons for rejecting this argument.

First, it presumes too much. Arguments premised on opened floodgates and broken dams are not persuasive where, as here, we suspect that only a few drops of water may spill onto a barren desert. To actually recover in this case, Daniel will be required to prove (not merely allege) that a physician and a teaching hospital, knowing they had inadvertently infected a patient with a contagious disease that is almost always deadly, failed to tell her what had happened and failed to warn her about the danger in infecting her loved ones. Daniel will also have to prove causation—not just that Jennifer would have told him about her illness and that he would then have refrained from intimate contact with her but also that he could not have acquired the disease elsewhere. We recognize the sympathetic nature of Daniel's case and the probability that jurors might be inclined to construe the evidence in favor of a young man and against those whose negligence probably sentenced him to death. But the very facts which favor Daniel in this case show how unlikely it is that there are dozens of other Daniels waiting in the wings.

Second, the argument goes too far. We need not decide in this case what the result would be if someone infected by Daniel sued the doctor who failed to warn Jennifer, and the fact that a duty is owed to Daniel does not mean it will be extended without limitation. However, the possibility of such an extension does not offend us, legally or morally. Viewed in the abstract (and *not* with reference to Jennifer or Daniel), we believe that a doctor who knows he is dealing with the 20th Century version of Typhoid Mary[6] ought to have a very strong incentive to tell his patient what she ought to do and not do and how she ought to comport herself in order to prevent the spread of her disease. In any event, the doctor's liability to fourth and fifth persons would by its nature be limited by traditional causation principles. (*Nola M.* v. *University of Southern California* (1993) 16 Cal.App.4th 421, 427-428 [20 Cal.Rptr.2d 97].)

In short, we see no reason to limit duty in this particular case.

---

[6]In the early 1900's, Mary Mallon, an Irish cook working in the United States, was a typhoid carrier who, herself immune to the typhoid bacilli, unwittingly infected virtually everyone with whom she came in contact (51 original cases were directly attributed to her). (Webster's Third New Internat. Dictionary (1981) p. 2476; 12 New Encyclopaedia Britannica (15th ed. 1988) p. 88.)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to set the case for trial. Daniel is awarded his costs of appeal.

Ortega, Acting P. J., and Masterson, J., concurred.

A petition for a rehearing was denied February 16, 1995, and respondents' petition for review by the Supreme Court was denied May 18, 1995.