SMITH, Chief District Judge,
dissenting:
As the majority states, our hearts are with Ms. Dugard. But for the incompetence of both California and federal officials, the unspeakable crimes committed by Garrido would never have occurred. Ms. Dugard has been compensated by California; and in my view she should have her day in court against the federal government as well. I differ with the majority’s conclusion that the law does not allow her this, and therefore I respectfully dissent.
The majority’s decision turns on its understanding that the most analogous California cases for the purposes of determining liability under the Federal Tort Claims Act (“FTCA”) are those involving private rehabilitation centers. In my view, this is an incorrect application of the FTCA and misinterprets the body of California tort law of which the so-called private rehabilitation center cases are an inextricable part.
As the majority notes, the FTCA is a limited waiver of sovereign immunity and provides that the United States is liable for the negligent conduct of its employees “in the same manner and to the same extent as a private individual under like circumstances.” 28 U.S.C. § 2674; see also 28 U.S.C. § 1346(b). When determining whether a state actor is analogous to a private entity, courts must “interpret these words to mean what they say, namely, that the United States waives sovereign immunity ‘under circumstances’ where local law would make a ‘private person’ liable in tort.” United States v. Olson, 546 U.S. 43, 44, 126 S.Ct. 510, 163 L.Ed.2d 306 (2005) (emphasis in original) (quoting 28 U.S.C. § 1346(b)(1)). And, when conducting this analysis, common sense dictates that “where the government, and its private party counterpart diverge in a significant respect, that circumstance must be taken into account in determining what is the ‘most reasonable analogy.’ ” Bush v. Eagle-Picher Indus., Inc., 927 F.2d 445, 452 (9th Cir. 1991) (quoting LaBarge v. Mariposa County, 798 F.2d 364, 367 (9th Cir. 1986)), abrogated on other grounds by Scheming v. Traylor Bros., 476 F.3d 781, 783 (9th Cir. 2007).
Here, on the surface, the “private rehabilitation center cases” cited by the government and relied on by the majority[1] provide a tempting analogue to the United States Parole Commission because both deal broadly with individuals who have broken the law and are in some stage of incarceration, transition on parole/probation, or supervision; however, upon closer examination, it is clear that these cases represent an exception to the general rule under California tort law that, where there is a special relationship, there is a duty to warn or control that extends to foreseeable, but not readily identifiable victims, provided that the action required would be *923 reasonable and not futile. As I explain m detail below, the courts in the private rehabilitation center cases effectively granted those facilities a form of immunity— essentially a carbon copy of the immunity enjoyed by their public counterparts — because they found that the public policy considerations were so strong as to preclude a finding of a duty. Irrespective of the majority’s suggestion to the contrary, no such considerations are present in this case, and there is virtually no policy reason to extend this narrow judicially created immunity to U.S. Probation. Thus, it is the general body of “special relationship” cases, rather than the private rehabilitation center exception, that provides a closer private party analogue, and summary judgment in favor of the government is not warranted.
I. The Duty to Control or Warn under California Law
In order to set the stage for the private person analogy analysis on which this case turns, and to understand where I part company with the majority, a chronological review of the development of California tort law concerning the duty to control and/or warn is necessary.
In 1966, in Poncher v. Brackett, 246 Cal.App.2d 769, 55 Cal.Rptr. 59 (Ct. App. 1966), a California Court of Appeals held that grandparents had a duty to an unidentifiable victim of their violent grandson. The court explained that:
The governing principle is expressed in section 319 of the Restatement Second of Torts as follows: “One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.”
Id. at 772-73, 55 Cal.Rptr. 59. The court clarified that “[t]he ability to control the child, rather than the relationship as such, is the basis for a finding of liability on the part of a parent.” Id. at 772, 55 Cal.Rptr. 59. That is, it was not because it was a grandparent-child relationship in particular that the duty attached, but rather because it was some type of “special relationship” in which there was an ability to control.
In Johnson v. State, 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), the Supreme Court of California found that state employees had a duty to warn foster parents of the violent criminal history of a teenage parolee placed in their care. In so holding, the Court found that the state employees did not have immunity under Government Code section 845.8, which provides that: “Neither a public entity nor a public employee is liable for: (a) Any injury resulting from determining whether to parole or release a prisoner or from determining the terms and conditions of his parole or release or from determining whether to revoke his parole or release.” Id. at 795 n.9, 73 Cal.Rptr. 240, 447 P.2d 352 (quoting Cal. Gov’t Code § 845.8); see id. at 795-96, 73 Cal.Rptr. 240, 447 P.2d 352. In giving this narrow application to section 845.8, the court reasoned that “[ojnce an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity.” Id. at 795, 73 Cal.Rptr. 240, 447 P.2d 352. The court added that “[tjhis analysis, allowing immunity for basic policy decisions ... but rejecting it for the ministerial implementation of that basic policy, receives support from a long line of cases in California and in federal courts, interpreting similar ‘discretionary’ language in section 2680, subdivision (a), of the Federal *924 Tort Claims Act.” Id. at 796, 73 Cal.Rptr. 240, 447 P.2d 352.
Eight years later, in the landmark case Tarasoff v. Regents of University of California, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), the Supreme Court of California considered whether a therapist had a duty to warn a person threatened by a patient, notwithstanding the general confidentiality obligations of that profession. There, the therapist had notified the police of a threat made by the patient, but did not notify the specific person about whom the threat had been made — Tatiana Tarasoff — or her parents. Id. at 430-31, 551 P.2d at 340. The court held “that defendant therapists cannot escape liability merely because Tatiana herself was not their patient” because the “special relationship” between therapist and patient created a duty “to use reasonable care to protect the intended victim against such danger.” Id. at 431, 551 P.2d at 340. What constitutes “reasonable care,” the court said, depends on the circumstances: “it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.” Id. at 431, 551 P.2d at 340 (emphasis added).
In 1979, Beauchene v. Synanon Foundation, Inc., 88 Cal.App.3d 342, 151 Cal. Rptr. 796 (Ct. App. 1979), considered whether a private rehabilitation facility could be held liable for the criminal conduct of a convict who, after being released into the defendant’s care, escaped and injured the plaintiff. The plaintiff argued that the facility had been negligent in screening the convict and that he should never have been let into the program. Id. at 345, 151 Cal.Rptr. 796, 798-99. The issue in Beauchene was whether the facility owed the plaintiff a duty based on the “special relationship ... between the defendant and the active wrongdoer.” Id. at 347, 151 Cal.Rptr. 796, 798-99 (citing Tarasoff, 17 Cal.3d at 435, 131 Cal.Rptr. 14, 551 P.2d 334). The court found no liability on public policy grounds. Id. at 348, 151 Cal.Rptr. 796. The court first explained that under California law:
Principal policy considerations in deciding whether a duty exists include “the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant’s conduct and the injury suffered, the moral blame attached to the defendant’s conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.”
Id. at 347, 151 Cal.Rptr. 796 (quoting Rowland v. Christian, 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561 (1968)). With that framework in mind, the court found that “[although appellant’s injuries may be grievous, ‘[of] paramount concern is the detrimental effect a finding of liability would have on prisoner release and rehabilitation programs. Were we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of them rights and society’s needs.’ ” Id. at 348, 151 Cal.Rptr. 796, 798-99 (emphasis added) (quoting Whitcombe v. County of Yolo, 73 Cal.App.3d 698, 716, 141 Cal.Rptr. 189 (1977)). In order to address the paramount concern about the effect that liability would have on the development of innovative prisoner release and rehabilitation programs, the Court reached for the immunity cloak provided by section 845.8 to public entities and employees discussed and distinguished in Johnson, and applied it to private facilities as if they were public:
*925 Respondent concededly is not a “public entity or public employee” within the meaning of section 845.8. But the same public policy that moved the Legislature to immunize public release and rehabilitation programs from liability — to encourage such innovations in the interests of criminal justice — compels the conclusion that respondent’s private release and rehabilitation program owed no legal duty to this appellant. In light of the purpose behind the governmental immunity, it would be incongruous to hold that, while the state is immune from liability for its decision to assign Bentley to, and his unauthorized departure from, the Synanon program, the program itself owed appellant a duty not to accept Bentley or to prevent his unauthorized departure.
Id. (emphasis in original). Thus, the Beau-chene decision was driven by the court’s conclusion that “[t]o hold respondent civilly liable would deter the development of innovative criminal offender release and rehabilitation programs, in contravention of public policy.” Id.
Following Beauchene, the Supreme Court of California decided Thompson v. County of Alameda, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728 (1980). There, a juvenile offender who was released from a county detention facility into the custody of his mother had threatened that, if released, he would kill a young child in the neighborhood. Id. at 746, 167 Cal.Rptr. 70, 614 P.2d 728. The court held that the county of Alameda had no duty to warn the neighborhood parents, the police, or the child’s mother. Id. at 758, 167 Cal. Rptr. 70, 614 P.2d 728. The court explained that “[i]n deciding whether a duty to warn should be imposed, we inquire under our Rowland v. Christian, [69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561 (1968) ], formulation concerning the probable beneficial effect if such warnings were routinely and generally given.” Id. at 755, 167 Cal. Rptr. 70, 614 P.2d 728. The court then reasoned:
We are skeptical of any net benefit which might flow from a duty to issue a generalized warning of the probationary release of offenders. In our view, the generalized warnings sought to be required here would do little to increase the precautions of any particular members of the public who already may have become conditioned to locking their doors, avoiding dark and deserted streets, instructing their children to beware of strangers and taking other precautions.
Id. The court distinguished Johnson and Tarasojf because in those cases there was a specifically identifiable victim, and therefore a warning would not have been futile or against public policy:
[I]t is fair to conclude that warnings given discreetly and to a limited number of persons would have a greater effect because they would alert those particular targeted individuals of the possibility of a specific threat pointed at them. In contrast, the warnings sought by plaintiffs would of necessity have to be made to a broad segment of the population and would be only general in nature. In addition to the likelihood that such generalized warnings when frequently repeated would do little as a practical matter to stimulate increased safety measures, as we develop below, such extensive warnings would be difficult to give.
Id. at 755, 167 Cal.Rptr. 70, 614 P.2d 728. The court acknowledged that, “[i]n those instances in which the released offender poses a predictable threat of harm to a named or readily identifiable victim or group of victims who can be effectively warned of the danger, a releasing agent *926 may well be liable for failure to warn such persons.” Id. at 758, 167 Cal.Rptr. 70, 614 P.2d 728 (emphasis added). With respect to the police, the court noted that “warnings to the police as urged by plaintiffs ordinarily would be of little benefit in preventing assaults upon members of the public by dangerous persons unless we were simultaneously and additionally to impose a concurrent duty on the police to act upon such warnings. As we noted in Tarasoff, supra, no such duty to act exists.” Id. at 756, 167 Cal.Rptr. 70, 614 P.2d 728. Finally, regarding the juvenile offender’s mother, the court reasoned that:
notification to the offender’s mother of James’ threat in our opinion would not have the desired effect of warning potential victims, at least in a case such as that herein presented.... The imposition of an affirmative duty on the County to warn a parent of generalized threats without additionally requiring, in turn, some affirmative action by the parent would prove ineffective.
Id. at 757. As with the police, because the mother did not have a duty to take some affirmative action upon receiving the information about her son’s threat, the court found that the warning would not have been effective.
Notably, Justice Tobriner, the author of Johnson and Tarasoff, dissented from the majority’s formulation, finding that the failure to warn the mother did state a cause of action. Justice Tobriner explained that “the absence of an identifiable victim does not postulate the absence of a duty of reasonable care.” Id. at 760, 167 Cal.Rptr. 70, 614 P.2d 728. “Instead, [Johnson and Tarasoff] stand for the principle that a special relationship, such as that between the state and a person in its custody, establishes a duty to use reasonable care to avert danger to foreseeable victims. If the victim can be identified in advance, a warning to him may discharge that duty; if he cannot be identified, reasonable care may require other action.” Id. The fact that the specific victim was not identifiable in advance “cannot absolve the state from its failure to warn James’ mother so that she could exercise proper care in observing and supervising James and thereby preventing the harm that ensued.” Id. at 761, 167 Cal.Rptr. 70, 614 P.2d 728. The majority countered this argument — not by disputing the dissent’s formulation of the law concerning an identifiable victim — but instead by noting that “[t]he dissentfs] speculation] that the mother ‘might’ have taken special care to control her son had she been warned of James’ threats” was “attenuated conjecture,” which “cannot alone support the imposition of civil liability.” Id. at 757, 167 Cal.Rptr. 70, 614 P.2d 728. Moreover, the majority explained, “it is contrary to the very purpose of such a release to speculate. that a mother in whose care a nearly 18-year-old offender has been temporarily placed would thereby assume the constant minute-to-minute supervision that would have been required to prevent the tragedy.” Id. at 758, 167 Cal. Rptr. 70, 614 P.2d 728.[2]
At the heart of the majority’s decision in Thompson was a deep concern about expanding the reach of Johnson — which held that statutory immunity under section 845.8 did not protect a county from liability for failure to warn of danger disconnected from the decision to parole — and Tara-soff — which cemented the probability of *927 liability for failure to warn in special relationship situations — to require that the government issue “generalized warnings” to the public every time a parolee is released.[3] Indeed, the question before the court in Thompson was actually quite narrow: “[W]e examine the propriety of imposing on those responsible for releasing or confining criminal offenders a duty to warn of the release of a potentially dangerous offender who, as here, has made a generalized threat to a segment of the population.” Id. at 750, 167 Cal.Rptr. 70, 614 P.2d 728 (emphasis added). Looking to Beauchene for support, the court found that these generalized warnings would be against public policy:
Furthermore, such notice might substantially jeopardize rehabilitative effort both by stigmatizing released offenders and by inhibiting their release. It is also possible that, in addition, parole or probation authorities would be far less likely to authorize release given the substantial drain on their resources which such warnings might require. A stated public policy favoring innovative release programs would be thwarted.
Id. at 757, 167 Cal.Rptr. 70, 614 P.2d 728. The majority found further support in the fact that “the County’s original decision to release James ... is a decision we already hold is immunized from liability.” Id. at 757-58, 167 Cal.Rptr. 70, 614 P.2d 728.
On the heels of Thompson, this Circuit upheld the finding of no duty in a case where a Job Corps program faded to control its residents. Vu v. Singer Co., 706 F.2d 1027, 1030 (9th Cir. 1983). The Court came to this conclusion for two reasons. First, it found that California law with respect to the duty to warn mandates that the “victim must be foreseeable and specifically identifiable.” Id. (citing Thompson, 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728). Second, the # Court pointed to the same policy concerns voiced in Beauchene:
To impose on the operator of a center a duty to prevent the tortious acts of corps members and to impose liability to the victims of such acts for having failed to do so would place in some degree of jeopardy the Job Corps program and its efforts towards the rehabilitation of disadvantaged young people. Faced with such potential liability an operator with any concern for its economic survival could be expected to terminate from the corps any person whose conduct suggests that he might pose a risk, whether it otherwise justifies termination or not. This would deprive of the program’s benefits those most in need of rehabilitation.
Id.[4]
One month later, however, Myers v. Quesenberry clarified the holding of Thompson, stating that “the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim ... does not preclude him from stating an action.” 144 Cal. App.3d 888, 892, 193 Cal.Rptr. 733 (Ct. App. 1983). In Myers, a doctor had failed *928 to warn a patient not to drive due to her uncontrolled diabetic condition; she struck the plaintiff, who sued the doctor. The court’s analysis centered on the fact that “[a]s a practical matter, the doctors here could not have effectively warned [the plaintiff victim] Myers of the danger presented by [the patient] Hansen’s driving .... However, they could easily have warned Hansen not to drive because of her irrational and uncontrolled diabetic condition.” Id. at 892-93, 193 Cal.Rptr. 733, 734-35 (citations omitted). Of significance was the fact that “this probably would not have been a futile act. Having otherwise complied -with her doctors’ professional recommendations, Hansen presumably would have continued to follow their advice had they warned her not to-drive.” Id. at 893, 193 Cal.Rptr. 733, 734-35. The court distinguished this holding from Thompson — not because it involved a doctor-patient relationship, as the majority argues— but because the warning would not, as a matter of law, have been futile: “Hansen is unlike the homicidal actors in Thompson and Tarasoff.... On these pleadings, we cannot factually presume Hansen would have ignored the doctors’ warning.” Id. Therefore the court concluded that “under these circumstances where warning the actor is a reasonable step to take in the exercise of the standard of care applicable to physicians ..., liability is not conditioned on.potential victims being readily identifiable as well as foreseeable.” Id. (emphasis added) (citing Thompson, 27 Cal.3d at 752-53, 758, 167 Cal.Rptr. 70, 614 P.2d 728; Mavroudis v. Superior Court, 102 Cal.App.3d 594, 599-601, 162 Cal.Rptr. 724 (Ct. App. 1980)).
In 1987, Cardenas v. Eggleston Youth Center, 193 Cal.App.3d 331, 238 Cal.Rptr. 251 (Ct. App. 1987), again shielded a private rehabilitation facility from liability. As with Beauchene, the result was wholly driven by public policy:
We are persuaded that the public policy concerns that led the Beauchene court to find no duty on the part of that respondent should lead us to the same conclusion in the case at bar. We recognize that plaintiff has been grievously injured, but to permit him recourse against defendant would have a potentially devastating impact on private rehabilitation programs. Such programs, particularly in these times of overcrowded penal facilities, serve an indispensable public function. Forced to choose between the competing interests presented in this case, we must, like the Beauchene court, without in the least minimizing the seriousness of the injury to the individual, defer to the imperative policy objective of encouraging innovative release and rehabilitation programs for criminal offenders.
Id. at 335-36. The fact that the victims were not specifically identifiable again did not factor into the analysis.
In 1995, a California Court of Appeals reached a similar decision to that in Myers in Reisner v. Regents of University of California, 31 Cal.App.4th 1195, 37 Cal. Rptr.2d 518 (Ct. App. 1995). There, a doctor failed to inform a patient, Jennifer, that she had contracted HIV from a blood transfusion. Id. at 1198, 37 Cal.Rptr.2d 518, 520. She later infected her partner, Daniel, who sued the doctor. Id. As in Myers, the court held that “[f]or several reasons, it is immaterial that, in Tarasoff, the therapist knew the identity of his patient’s intended victim whereas, in this case, Defendants did not know Daniel or even that he existed.” Id. at 1199, 37 Cal. Rptr.2d 518, 520. In particular, “warning Jennifer would have been a reasonable step to take in the exercise of the standard of care applicable to physicians ... and we cannot factually presume Jennifer or her parents would have ignored Defendants’ *929 warning.” Id. at 1200, 37 Cal.Rptr.2d 518, 520 (emphasis added).
In 2003, Bragg v. Valdez, 111 Cal. App.4th 421, 3 Cal.Rptr.3d 804 (Ct. App. 2003), held a psychiatrist liable for releasing a dangerous patient from a psychiatric hospital because the patient did not have insurance. The court noted that “without receiving any therapy, and without any notification to any other mental health care provider or the police, Lee was turned loose into an unsuspecting community. ... It is foreseeable that someone who is dangerous to others is liable to act out and be dangerous.” Id. at 431, 3 Cal. Rptr.3d 804, 810-11. The court explained:
This rule is in accordance with Tarasoff and subsequent case law that holds, “When the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant’s duty extends to a third person with whom the defendant does not have a special relationship.”
Id. at 432, 3 Cal.Rptr.3d 804, 810-11 (quoting Reisner, 31 Cal.App.4th at 1198, 37 Cal.Rptr.2d 518).
The court also found that the psychiatrist was not immune under two state statutes: one granting immunity to psychiatrists who release patients prior to the end of the initial 72-hour commitment, and another, enacted after Tarasoff, that mandated that there could be no monetary liability to warn of a patient’s threats “except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims.” Id. at 432-34, 3 Cal.Rptr.3d 804, 810-11. The court reasoned that “[t]his case is not dealing with judgment calls, but a dereliction of judgment.” Id. at 435, 3 Cal.Rptr.3d 804, 810-11. Thus, it did not fall under the purview of either of these statutes, the first of which was enacted to prevent the “inappropriate, indefinite, and involuntary commitment of mentally disordered persons” by protecting a doctor’s assessment of whether or not the person is a danger; and the second, which “sought to protect [ ] the privileged communications between a psychotherapist and his or her patient in a treatment setting.” Id. at 432-35, 3 Cal. Rptr.3d 804, 810-11. Moreover, the court found that “the trial court erred [] in analyzing this case as a Tarasoff case.” Id. at 434, 3 Cal.Rptr.3d 804. Concluding that the “complaint [did] not allege a failure to warn a known victim,” but instead concerned “a negligent release based upon factors other than the professional judgment that is required when a psychiatrist treats an individual who is a danger to himself or to others,” the court held that “Tarasoff [was] inapplicable.” Id.
In 2007, a California Court of Appeals again found that a private rehabilitation center did not owe a duty to the general public in its vicinity. Rice v. Ctr. Point, Inc., 154 Cal.App.4th 949, 959, 65 Cal. Rptr.3d 312 (Ct. App. 2007). In Rice, the court implicitly acknowledged that the fact that the plaintiffs were not identifiable victims was not fatal to their claim: the court first noted that “[h]ere, it is clear that defendants did not owe a duty to the plaintiffs as the foreseeable victims of the residents’ criminal conduct,” but then went on to state that “[t]he more difficult question is whether a special relationship existed between defendants and their residents giving rise to a duty owed to the public to exercise reasonable care to control the criminal conduct of their residents.” Id. at 955-56, 65 Cal.Rptr.3d 312, 316 (emphasis added). On this second question, Rice’s outcome, like Beauchene and Cardenas, *930 was driven almost exclusively by public policy. The court first noted that, “[i]n Beauchene, ... the court concluded that public policy considerations preclude the imposition of such a duty on the operators of a rehabilitation facility.” Id. at 956, 65 Cal.Rptr.3d 312, 316 (emphasis added). The court then rejected the plaintiffs attempts to distinguish Beauchene and Cardenas, based on the fact that the Rice defendants had violated mandatory rules, reasoning that “[the facilityj’s failure to follow applicable operational policies or procedures did not give rise to a duty where none otherwise existed. Defendants’ failure to comply with applicable safety regulations would at most demonstrate a lack of reasonable care, i.e. breach of the duty of care if such a duty were first determined to exist.” Id. at 958, 65 Cal. Rptr.3d 312, 316 (emphasis added).
Reading these cases as a whole makes clear that rather than two separate lines of cases — one dealing with doctors and the other dealing with rehabilitation facilities — this is a single line of cases dealing with the fundamental duty to control or warn, based on a special relationship, which has developed (sometimes awkwardly) over nearly 50 years. This line of cases begins with the general rule that a defendant has no duty to warn third parties who are harmed by a tortfeaser. An exception to this rule based on “special relationships” was recognized by the California courts in Poncher (1966) and Johnson (1968). In these cases, the court unequivocally said there was a duty to warn and/or control a person who posed a risk of harm to third persons which was reasonably foreseeable. (Tarasojf further refined this duty with respect to specifically identifiable victims in certain circumstances.) In the decisions that followed, the courts enacted a judicially created immunity for private rehabilitation facilities and similar programs based on important public policy considerations (an exception to the exception, so to speak). And where these policy considerations have not been present (mostly in the physician and psychiatrist context), the Court has continued to apply the Poncher/Johnson duty analysis.
Moreover, a slight but important refinement of the case law occurred with Myers, which clarified that a victim must be “foreseeable,” but need not be “readily identifiable.” Myers, 144 Cal.App.3d at 892, 193 Cal.Rptr. 733.[5] Instead, Myers and subsequent cases dealing with victims who were not readily identifiable, focus on whether the proposed action that the defendant failed to take would have been “reasonable” given the facts of the case and public policy, and whether or not it would have been “futile.” Id. at 892-93, 193 Cal.Rptr. 733, 734-35. The only exception is Rice, which did not reach the issue of whether a warning would have been futile becahse it found that “public policy considerations preclude[d] the imposition of such a duty on the operators of a rehabilitation facility.” 154 Cal.App.4th at 956, 65 Cal.Rptr.3d 312 (emphasis added). This is the same public policy mandate that drove the decisions in the earlier rehabilitation cases. See Cardenas, 193 Cal.App.3d at 335-36, 238 Cal.Rptr. 251 (“Such programs, particularly in these times of overcrowded penal facilities, serve an indispensable public function. Forced to choose between the *931 competing interests presented in this case, we must, like the Becmchene court, without in the least minimizing the seriousness of the injury to the individual, defer to the imperative policy objective of encouraging innovative release and rehabilitation programs for criminal offenders.” (emphasis added)); Vu, 706 F.2d at 1030 (“[T]he same public policy that moved the Legislature to immunize public release and rehabilitation programs from liability — to encourage such innovations in the interests of criminal justice — compels the conclusion that respondent’s private release and rehabilitation program owed no legal duty to this appellant.” (second emphasis added; first and third in original)).
Critically, nothing in Myers limits its holding to a doctor-patient relationship. And the court had that opportunity: in distinguishing Thompson, the court could have said that the duties that exist in the doctor-patient context do not exist in other special relationships. Instead, the Myers court found that, unlike in Thompson, it could not “factually presume Hansen would have ignored the doctors’ warning.” Myers, 144 Cal.App.3d at 893, 193 Cal. Rptr. 733. In Thompson, by contrast, the majority found that all of the suggested warnings — including warning the mother, about which the dissent disagreed — would have been futile, and further, would have created bad public policy. 27 Cal.3d at 756, 167 Cal.Rptr. 70, 614 P.2d 728. However, in cases where there is a third party who can be “effectively warned of the danger,” id. at 758, 167 Cal.Rptr. 70, 614 P.2d 728, or another action that could easily be taken to prevent the harm without creating bad policy, there is a duty. See Bragg, 111 Cal.App.4th at 431-34, 3 Cal.Rptr.3d 804; Reisner, 31 Cal.App.4th at 1198-1203, 37 Cal.Rptr.2d 518; Myers, 144 Cal.App.3d at 892-94, 193 Cal.Rptr. 733.
II. Most Analogous Private Party
With this backdrop in mind, I turn to determining whether “a private individual under like circumstances,” 28 U.S.C. § 2674, to Defendant would be held liable under California law.
The two most recent cases — Bragg and Rice — are both progeny of Puncher and Johnson, and both present potentially compelling analogies: a psychiatrist who released a mentally ill and dangerous patient into society, and a private rehabilitation facility from which several inmates escaped. In both of these cases, like in the instant case, the question was whether a party responsible for a dangerous person having the opportunity to commit a crime could be held liable for the harm caused. Yet the California courts came to opposite conclusions: while the psychiatrist was held liable, the private rehabilitation facility was not. The question is why the opposite results? The answer to that question reveals which case is more analogous to this one.
Taking a close look at these cases, it becomes clear that Bragg, not Rice, presents the “like circumstances” to this case under California law. The majority simplistically characterizes my argument as preferring “a line of California cases, particularly involving medical professionals,” Majority at 921, to the private rehabilitation cases. But as my analysis above demonstrates, the majority clearly misses the point — we are dealing here with one line of cases, typified by the physician and psychologist examples, to which there is an exception for private rehabilitation facilities based on policy grounds. Although I concede that it is tempting to conclude, as the majority has, that because this case deals with the prison system rather than the medical system, Rice seems more analogous; but that is a red herring that distracts from the real comparison. The public policy considerations that dictated *932 the result in private rehabilitation cases like Rice (the need for immunity and the futility of the putative warning) simply do not exist in this case. Instead, the policy motivations and the futility question in the present case align much more closely to those in Bragg and demonstrate that a private person under circumstances similar to those here would be liable under California tort law.[6]
In Bragg, the court determined that “[preventing future incidents is [] furthered by imposing a duty to the injured party.” 111 Cal.App.4th at 431, 3 Cal. Rptr.3d 804. Simply put, public policy favored imposition of a duty on hospitals to refrain from releasing dangerous patients simply because they do not have insurance. Moreover, the action required — not releasing the patient — clearly would not have been futile; it would have prevented the patient from committing the tort.[7] By contrast, in Rice, the court found that “public policy considerations preclude the imposition of such a duty on the operators of a rehabilitation facility.” 154 Cal.App.4th at 956, 65 Cal.Rptr.3d 312. The court in Rice explained that “[w]ere we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society’s needs.” 154 Cal.App.4th at 956, 65 Cal. Rptr.3d 312 (emphasis added). As a practical matter, liability for private rehabilitation facilities would result in those facilities going out of business and a worsening of the already daunting prison crisis in California.
*933 Here, the public policy concerns align much more closely to Bragg than Rice and the other rehabilitation center cases. The private rehabilitation facility cases turned on the assumption that imposing liability would be the death knell of such facilities and that it would be “incongruous” to attach liability to private facilities for actions for which their public counterparts were immune. These concerns simply do not exist in this case.
The majority suggests that the policy concerns that animated the private rehabilitation cases are equally present in the federal probation system, drawing support from a publication of the Administrative Office of the United States Courts, which contains some generic statements about flexible and innovative approaches to offender management and supervision. Noting that the goals of the parole and probation systems “rang[e] from protecting the public from further crime to providing the offender with needed education, vocational training, medical care, and other correctional treatment,” Majority at 920 (quoting Probation Division, Administrative Office of the United States Courts, The Supervision Process, Publication 106, at 21 (1983), the majority posits that, “[ijmposition of broader liability logically forces this range of goals to shift to the former (protecting the public), and away from the latter (education, vocational training, medical, and correctional treatment).” Id. For the reasons outlined below, the majority’s suggestion just does not hold water: the policy concerns of federal probation and parole are not at all aligned with the concerns described in the private rehabilitation cases.
To begin, the publication cited by the majority makes clear that parole and probation officer’ primary responsibility is to keep apprised of and report on the behavior of the individuals they supervise, and the “flexible approach” must be consistent with those mandatory responsibilities:
The supervision responsibilities of probation officers begin with the statutory obligation set forth at title 18, USC, 3665, “to keep informed concerning the conduct and condition of each probationer under supervision and report thereon to the court placing such person on probation.”
This function is also performed for persons on parole on behalf of the United States Parole Commission. For offenders who do not abide by the conditions of supervision, it is the responsibility of the probation officer to promptly report this information to the court or Parole Commission. The probation officer is also mandated by statute to “use all suitable methods, not inconsistent with the conditions imposed by the court, to aid probationers to bring about improvements in their conduct and condition.”
Publication 106, at 2 (emphasis added).
Second, there is virtually no risk that imposing an obligation on federal parole officers to follow their mandatory reporting duties will result in fewer people being released on parole. For starters, the U.S. Parole Commission effectively went out of business in the 1980s with the passage of the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1988 (codified at 18 U.S.C. § 3551, et seq.). No offender has been put on parole in nearly 30 years. The only function of the Parole Commission since 1988 has been the management of defendants who were paroled prior to that date. Since the late 1980s, sentencing decisions lie exclusively with federal district judges, who prescribe both the length of incarceration and supervision, or, alternatively, non-incarcerative probation. These decisions, of course, all enjoy judicial immunity, and no district judge worth his or *934 her salt would ever decide to incarcerate a defendant for a longer period than required to meet the objectives of 18 U.S.C. § 3553 out of fear of creating liability for federal probation. The idea is unthinkable. To be sure, federal probation officers supervise defendants during their terms of supervised release or probation, but probation officials are not responsible for deciding when a prisoner gets released. Consequently, there is virtually no risk that holding such officials responsible for negligence for their failure to perform nondis-cretionary functions will in any way undermine new or creative rehabilitation programs, or result in defendants being kept in prison for longer than necessary. Rather, imposing the duty of reasonable care called for by Poncher, Johnson, Ta-rasojf, and Bragg, will better ensure that U.S. Probation officers perform their duties carefully, and follow protocols dutifully, as they should, bringing violations to the attention of U.S. District Judges (or, in the present case, the U.S. Parole Commission). Simply put, the concern of the California courts was that third party liability to foreseeable (but not specifically identifiable) victims would make opening and operating private rehabilitation facilities financially untenable. No such concern exists in the federal probation system. Regardless of what liability exists for federal probation officer’ misdeeds, U.S. Probation will continue to supervise defendants as directed by federal judges.
Third, the California courts’ concern about holding private and public facilities to different standards is not at play here. The Supreme Court of California recognized in Johnson that the policy considerations underlying the immunity provided by Section 845.8, did not apply in a situation like this one where the decision concerned “ministerial implementation” rather than a “policy decision[ ]”:
Once an official reaches the decision to parole to a given family, however, the determination as to whether to warn the foster parents of latent dangers facing them presents no such reasons for immunity; to the extent that a parole officer consciously considers pros and cons in deciding what information, if any, should be given, he makes such a determination at the lowest, ministerial rung of official action. Judicial abstinence from ruling upon whether negligence contributed to this decision would therefore be unjustified; coupled with the administrative laxness that caused the loss in the first instance, it would only result in the failure of governmental institutions to serve the injured individual.
Johnson, 69 Cal.2d at 795-96, 73 Cal.Rptr. 240, 447 P.2d 352 (emphasis added);[8] see also Vu, 706 F.2d at 1029 (“California courts have recognized that [section 845.8] provides an exception to the rule that special relationships can result in creation of duty.” (emphasis added)). Here, the challenged action (or in this case inaction) is not the policy decision that was made to release Garrido on parole, nor is it the policy decision that would have been in the Parole Commission’s discretion to revoke his parole; it is simply the parole officer’s ministerial task of reporting Garrido’s numerous drug violations to the Commission. Thus, the evaluation in the rehabilitation facility cases that “the same public policy that moved the Legislature to immunize public release and rehabilitation programs from liability [under section 845.8] — to en *935 courage such innovations in the interests of criminal justice — compels the conclusion that respondent’s private release and rehabilitation program owed no legal duty to this appellant,” Cardenas, 193 Cal.App.3d at 335, 238 Cal.Rptr. 251 (emphasis in original) (quoting Beauchene, 88 Cal. App.3d at 348, 151 Cal.Rptr. 796), does not apply to these facts. Moreover, the innovation currently taking place in the federal system is being driven primarily by the courts. To be sure, probation offices in innovative courts play a critical programmatic role, but the policy decision of whether to adopt a re-entry program or drug court or diversion program is a judicial function, not a probation function, so it cannot be said that imposing liability for probation officer’ misdeeds will stifle innovators and increase incarceration.
Fourth, this is not a situation where imposing liability would result in “frequently repeated [warnings that] would , do little as a practical matter to stimulate increased safety measures” and “would be difficult to give.” Thompson, 27 Cal.3d at 755, 167 Cal.Rptr. 70, 614 P.2d 728. Indeed, unlike the police and the mother in Thompson, the Parole Commission did have an affirmative duty to act upon receipt of the warning, and presumably would have acted in this case. So, futility too is not a concern.
In contrast, similarities between the public official actor in this case and the private actor in Bragg are numerous. Like Bragg, “[t]his case is not dealing with judgment calls, but a dereliction of judgment.” Bragg, 111 Cal.App.4th at 435, 3 Cal.Rptr.3d 804. Here, a parole officer failed to report over 70 drug violations for a parolee who was known to be extremely violent when under the influence of drugs. And in this case, like in Bragg — which analyzed the contours of the duty because the immunity and public policy issues that are peculiar to the private rehabilitation facilities were not applicable — “[preventing future incidents is [] furthered by imposing a duty to the injured party.” 111 Cal.App.4th at 431, 3 Cal.Rptr.3d 804. Indeed, if the prevailing public policy in California is to encourage alternative rehabilitation programs, applying the same duties to parole officers as those applied to physicians in Bragg and Myers would advance that policy. As many of the private rehabilitation cases note, there is an inherent risk involved in paroling criminals, a risk that is considerably exacerbated by parole (or probation) officers disregarding their responsibilities to the degree they were disregarded in this case. Mitigating the risk of danger associated with parole or probation/supervision by holding parole and probation officers responsible for carrying out their mandatory tasks, makes it more likely, not less, that the public and government officials, and more importantly judges and prosecutors, will support expansion of alternative rehabilitation programs. And moreover, imposing a duty on parole officers to conscientiously do their jobs has the added benefit of protecting the public during the expansion of these programs. In essence, the same public policy that drove the result in Bragg applies in the context of federal parole and supervision.
Indeed, just as in Bragg “the burden to the defendant” — here, that parole and probation officers follow mandatory reporting guidelines that they should be following anyway — is low; and, unlike in the private rehabilitation cases, the “consequences to the community of imposing a duty to exercise care with resulting liability for breach” are positive. See Myers, 144 Cal. App.3d at 894, 193 Cal.Rptr. 733 (“There also are no significant practical problems involved here in requiring physicians to warn patients not to engage in foreseeably dangerous conduct.... Our holding does *936 not require the physician to do anything other than what he was already obligated to do for the protection of the patient.”). As described above, imposing liability would increase the likelihood that officers will perform their duties, which in turn would enhance public safety, which in turn would increase the support for alternative rehabilitation programs.
Finally, as if more were needed, there is in this case a specific party to warn which had control of the wrongdoer by virtue of his status as a parolee: the Parole Commission. And the Court here cannot say that, as a matter of law, such a warning would have been futile.
To sum up then, the FTCA requires this Court to look to the closest private sector analogue to determine if a private party would have a duty in like circumstances. The line of eases we should look to is the “duty to control/duty to warn” cases which represent the special relationship exception to the general rule that there is no duty to third parties harmed by the wrongdoer. That line of cases has its roots in Poncher and Johnson. And as the cases have developed, an exception to the special relationship exception has evolved where public policy considerations demand parity for private rehabilitation facilities with the immunity afforded to public facilities, and/or where the warning suggested would be futile. Where neither of these policy-based concerns is present, the courts have continued to find a duty to control or warn, evidenced by Bragg (control), Tarasoff, Myers, and Reisner (warn). Here, the policy considerations undergirding the rehabilitation center exception cases are plainly not present, and the warning/control that Plaintiff claims should have been made both would likely have been effective and would have promoted exactly the behavior that tort law is meant to promote: greater care, vigilance, and concern for the safety of foreseeable victims.[9]
For all of these reasons, I would reverse the district court’s grant of summary judgment.

. See generally Vu v. Singer Co., 706 F.2d 1027 (9th Cir. 1983); Rice v. Ctr. Point, Inc., 154 Cal.App.4th 949, 65 Cal.Rptr.3d 312 (Ct. App. 2007); Cardenas v. Eggleston Youth Ctr., 193 Cal.App.3d 331, 238 Cal.Rptr. 251 (Ct. App. 1987); Beauchene v. Synanon Found., Inc., 88 Cal.App.3d 342, 151 Cal.Rptr. 796 (Ct. App. 1979).

. The Court’s conclusion on this point is dubious to be sure: a warning to the mother might very well have been effective; for example, reporting a threatening presence to the police and community is a mainstay of sex offender notification laws, both state and federal. See Sex Offender Registration and Notification Act, Pub. L. No. 109-248, Title I (2006). But that debate is beyond the scope of the question here.

. Although Thompson considers the duty of a public entity, its holding provides an important basis for the private rehabilitation cases that follow. Accordingly, the justifications for the holding in Thompson also form the justifications for exempting private rehabilitation facilities from their special duty — public policy concerns and the futility of any warning. As detailed below, neither of these justifications apply to federal parole officers, a difference that warrants looking to other analogous private entities.

. Judge Rothstein filed a concurrence in Vu, which recognized that the Court was bound by Thompson, but criticized that decision (relying on Justice Tobriner’s dissent) as ''enunciating] a myopic view of foreseeability in the context of the duty to warn and to supervise.” Vu, 706 F.2d at 1031 (Rothstein, J., concurring).

. The district court here relied on Vu for the proposition that "one must know that the target of the risk is an identifiable surd foreseeable victim.” Dugard v. United States, No. 3:11-cv-04718-CTB, 2013 WL 6228625, at *9 (N.D. Cal. Nov. 27, 2013). But Vu was decided before Myers, which clearly states that "the fact [that the plaintiff] was a foreseeable but not a readily identifiable victim ... does not preclude him from stating an action.” Myers, 144 Cal.App.3d at 892, 193 Cal.Rptr. 733.

. A recent district court decision with analogous facts applied a similar approach, using "a person responsible for controlling the acts of a third party as described in Section 319 of the Restatement (Second) of Torts” as "the closest private analog.” Ben v. United States, No. 5:14-CV-0370, 2016 WL 4477-13, at *11 (N.D.N.Y. Feb. 4, 2016). In that case, a criminal defendant, Renz, who had been charged with receiving and possessing child pornography, was released from custody prior to trial and placed on electronic monitoring under the supervision of U.S. Probation and Pretrial Services Office for the Northern District of New York. Id. at *1. However, "Probation did not follow [its] procedures in Renz's case. More specifically, Probation did not develop a supervision plan for Renz, did not inspect Renz’s electronic monitoring equipment (except perhaps on one occasion), and did not monitor Renz’s tamper alerts as required even though tampering with 'location monitoring’ equipment is considered a 'higher-risk violation.’ ” Id. at *3. While on supervised release, Renz committed crimes including kidnapping, rape, and murder. The court denied the government's motion to dismiss the FTCA claims against the government, finding that Probation "had sufficient control over Renz to support a duty under § 319.” Id. at *14. In doing so, the court rejected the government’s argument that someone on supervised release is more akin to a voluntary outpatient of a medical/psychiatric facility (where New York courts had found no duty), as opposed to someone involuntarily committed to a psychiatric facility (where courts had found a duty), because supervised release is not "in custody.” Id. Like in the instant case, on the surface, the outpatient cases looked more analogous because Probation did not have "actual physical custody of the dangerous third person”; however, the court looked past the seemingly similar circumstances in the outpatient cases and interpreted them "as holding that because the medical/psychiatric facilities had no other way of controlling the third parties' actions when they were away from the facilities,”- there was no duty. Id. Probation, by contrast, "had a relationship of control over Renz that did not require actual physical custody.” Id.

. It is important to keep in mind that Bragg's outcome did not hinge on the existence of a doctor-patient relationship; The psychiatrist was liable because the negligence did not occur in the course of the doctor-patient relationship; had the inverse been the case, the psychiatrist would have had statutory immunity. 111 Cal.App.4th at 432, 3 Cal.Rptr.3d 804. Thus, it cannot be said that the particular contours of the doctor-patient relationship, as opposed to the duties in other "special relationship” cases, drove the result.

. As Johnson and Thompson were both public entity cases, th,ey cannot be used as specific examples of a private person in like circumstances. However, as the majority notes, they nonetheless provide the foundation for the California tort law concepts and public policy issues at play in this case.

. The government also argues that Dugard’s claims are barred by the discretionary function exception of the FTCA and that there is insufficient evidence for a factfinder to determine that the parole officer’ alleged failure to report Garrido’s drug violations to the Parole Commission proximately caused Dugard’s harm. I agree with the district court's analysis and decision on these two issues and would find that neither provides grounds to bar Du-gard’s claims.